Thomas A. WILKES, Appellant,

v.

UNITED STATES, Appellee.

No. 91–CF–263.

District of Columbia Court of Appeals.

Argued Oct. 14, 1992.
Decided Sept. 23, 1993.

David Merchant, Public Defender Service, with whom James Klein and Sandra G. Roland, Public Defender Service, Washington, DC, were on the brief, for appellant.

Roy W. McLeese, III, Asst. U.S. Atty., with whom Jay B. Stephens, U.S. Atty. at the time the brief was filed, and John R. Fisher, L. Bruce Delaplaine, and Leslie Ann Wise, Asst. U.S. Attys., Washington, DC, were on the brief, for appellee.

Before TERRY and FARRELL, Associate Judges, and BELSON, Senior Judge.

TERRY, Associate Judge:

Appellant Wilkes was convicted of armed second-degree murder and related offenses.[1] At trial he raised an insanity defense and relied primarily on the expert testimony of a psychiatrist. To impeach that testimony, the government cross-examined the psychiatrist about two statements which the police had taken from Wilkes in violation of *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). Later, in rebuttal, the government introduced the statements through the testimony of two police officers. The government also presented three experts of its own, two psychiatrists and a psychologist, whose testimony was based in part on those statements and the conclusions they drew from them. Wilkes argues that the court erred in allowing the jury to learn of his statements in this manner, citing *James v. Illinois*, 493 U.S. 307, 110 S.Ct. 648, 107 L.Ed.2d 676 (1990). We conclude that *James* is distinguishable and does not control this case. We hold, following a consistent line of Supreme Court cases beginning with *Walder v. United States*, 347 U.S. 62, 74 S.Ct. 354, 98 L.Ed. 503 (1954), and extending through *Michigan v. Harvey*, 494 U.S. 344, 110 S.Ct. 1176, 108 L.Ed.2d 293 (1990), that evidence of the statements was properly heard by the jury. Accordingly, we affirm the convictions.

## I

Thomas Wilkes started dating Johnetta McLean in late 1988. By April 1989, however, problems in the relationship had resulted in at least two angry confrontations between Wilkes and McLean at the office of McLean's employer. Then, in early May, Wilkes apparently began stalking McLean.

On May 19, 1989, Wilkes followed McLean and a co-worker, Michelle Williams, after they left work and were driving home at about 5:00 p.m. Wilkes pulled alongside McLean's car, which was traveling south on the Anacostia Freeway (Interstate Route 295), and engaged in a brief conversation with her. When McLean asked Wilkes if he would be following her all day, he replied, "No." Wilkes then positioned his car[2] behind McLean's car and rear-ended her three or four times, forcing McLean's car off the road and into a ditch in the median strip. Wilkes stopped his car, walked over to McLean's car, and fired one or two shots toward it. McLean's car suddenly started and moved backwards out of the ditch and across the road, then went up an embankment, hit a fence, and became lodged against a tree. Wilkes came across the road to McLean's car, then raised his arm and fired four more shots at the driver's window. Three of those shots struck McLean. Wilkes then turned to fire at Williams. She tried to get down on the floor, but before she could do so, Wilkes fired once at her. The bullet struck her spinal cord, causing instant paralysis. After firing another shot in Williams' direction, he walked back across the road to his car and drove off. McLean died from the gunshot wounds to her head and chest. Williams survived, permanently paralyzed from the chest down.

Williams identified Wilkes to the police by name as the assailant. The next day Wilkes was arrested on a warrant by Metropolitan Police Sergeant Bobby Craig and other officers. Sergeant Craig briefly questioned him in the course of executing the warrant, but without advising him of his *Miranda* rights. Moments after entering Wilkes' apartment, Craig asked him where the murder weapon was, and Wilkes replied that he had "thrown it in a dumpster out in Virginia on Duke Street near to where he had parked the car." Wilkes was taken immediately to police headquarters, where Detective Robert Vacin of the Homi-

---

[1]. Specifically, appellant was convicted of second-degree murder while armed, D.C.Code §§ 22–2403 and 22–3202 (1989), assault with intent to kill while armed, §§ 22–501 and 22–3202, mayhem while armed, §§ 22–506 and 22–3202, carrying a pistol without a license, § 22–3204(a), and three counts of possession of a firearm during a crime of violence, § 22–3204(b).

[2]. It was later established that the car Wilkes was driving belonged to his sister.

cide Squad questioned him for approximately an hour before giving him any *Miranda* warnings. During this initial portion of his interrogation Wilkes described his relationship with Johnetta McLean. He also said "I did it" to Detective Vacin three times during this period, but he never explained what "it" was.

When Wilkes began to relate the events of the previous day, Detective Vacin interrupted and read him his *Miranda* rights. Wilkes did not then formally waive those rights. When he asked what crime he was being charged with, Vacin replied that the crime was murder, and Wilkes became upset. Detective Vacin testified that, on the basis of Wilkes' conduct at the time, "it wasn't clear in my mind that he was waiving his rights." The interview nevertheless continued for approximately one more hour. During this second portion of the interrogation Wilkes told Vacin that he had disposed of the gun in a dumpster or trash can outside a Peoples Drug Store in Alexandria, Virginia.[3] Detective Vacin then asked Wilkes again whether he was willing to waive his *Miranda* rights, but Wilkes expressly declined to do so and said that he wanted an attorney present before he would answer any more questions. Vacin then ceased the interrogation.

After a pre-trial hearing on the admissibility of Wilkes' statements to Sergeant Craig and Detective Vacin, the court concluded that the statements, although voluntarily made, had been taken in violation of *Miranda* and therefore could not be used in the government's case in chief. The court also ruled, however, that since the statements were voluntary, they would be "admissible for impeachment purposes on rebuttal" if Wilkes testified inconsistently with them.

■ At trial Wilkes relied on the defense of insanity.[4] The thrust of his defense was that he was afflicted with a mental disorder which resulted in blackouts and severe headaches, that he suffered from this disorder at the time of the shooting, that it caused him to have no recollection whatever of the crimes, and that he was therefore not criminally responsible for his conduct. Defense counsel called several family members and friends to testify about such blackout episodes in Wilkes' past.[5]

Also testifying was Michael Washington, a longtime friend of Wilkes. Washington said that Wilkes called him between 7:00 and 8:00 p.m. on May 19 at a bowling alley in Virginia where Washington played as a member of a bowling league. Wilkes told Washington that he was in Virginia but did not know how he had gotten there. Later that same night, at approximately 1:00 a.m., Wilkes telephoned his sister, Faye Wilkes. She testified that her brother did not sound like himself and that at first he seemed confused and did not recognize her voice.

■ The defense also relied on the expert testimony of Dr. George Saiger, a psychiatrist, who opined that Wilkes suffered from a "dissociative disorder" on May 19, 1989.[6] Dr. Saiger explained that

---

3. The car Wilkes had been driving was recovered by the police near a Dart Drug Store (not a Peoples Drug Store) in Alexandria. The gun, however, was never found.

4. To prevail in this defense, Wilkes was required to prove by a preponderance of the evidence that, as a result of a mental disease or defect, he lacked substantial capacity either to conform his conduct to the requirements of the law or to recognize the wrongfulness of his conduct. *Bethea v. United States,* 365 A.2d 64, 75 (D.C.1976), *cert. denied,* 433 U.S. 911, 97 S.Ct. 2979, 53 L.Ed.2d 1095 (1977); *see* D.C.Code § 24–301(j) (1989) (requiring proof of insanity by a preponderance of the evidence).

5. One defense witness, Wilkes' former supervisor, testified that on one occasion at work Wilkes "appeared to be passed out." The witness said that Wilkes was lying down with his eyes open, but that "he had actually no recognition." Another witness, Kevin Whitaker, described other such episodes. For example, Whitaker testified that one evening in 1978 Wilkes appeared at his home carrying a crowbar, but he could not recall how or why he had come to Whitaker's home or why he had a crowbar in his possession.

6. This diagnosis was based on an interview with Wilkes, interviews with his family, an extensive review of Wilkes' medical history, and documents prepared by the police in connection with their investigation.

this rare disorder involves a "disturbance in the usual integrated functioning of the psychological processes of memory, identity, and consciousness." As a result of this mental disease, the doctor concluded, Wilkes "was in a different state of awareness such that he was not able to either control his behavior or realize all the implications of what he was doing, including the illegality."[7]

The prosecutor sought permission to cross-examine Dr. Saiger about the statements Wilkes gave to the police after his arrest because the doctor had testified that his opinion was based in part upon Wilkes' statements to him that he lacked any memory of the events surrounding the charged offenses.[8] Over defense counsel's objection,[9] the court allowed the prosecutor to use the statements for the limited purpose of asking Dr. Saiger, in the form of a hypothetical question, whether his diagnosis would be different "if the defendant told someone, police officers, the day after the murder that he dumped the car and gun in Virginia and that he then came back in the city, knew the police were looking

for him." The court allowed the hypothetical question with the understanding that all facts assumed in it would be presented in the government's rebuttal case.

Dr. Saiger then testified that he had based his diagnosis of Wilkes' condition "in large part" on Wilkes' statement to him that he had no memory of the shootings. The significance of this information with respect to the diagnosis is not in dispute. Dr. Saiger readily acknowledged that if Wilkes "did remember [the events constituting the offenses] and lied when he said he didn't, the diagnosis would definitely be reconsidered."

The government's rebuttal case consisted primarily of expert testimony about Wilkes' mental condition as well as testimony from Sergeant Craig and Detective Vacin about the previously excluded statements. There were three expert witnesses, Drs. Kenneth Rogers and Neil Blumberg, both psychiatrists, and Dr. Mitchell Hugonnet, a clinical psychologist. All three unanimously concluded that Wilkes was not suffering from a mental disorder at the time of the crimes.[10] Each doctor considered

7. Experts are permitted in the District of Columbia to render opinions upon the "ultimate facts" to be resolved by the jury. "The real test is not [whether] the expert opinion testimony would go to the very issue to be decided by the trier of fact, but whether the special knowledge or experience of the expert would aid the court or jury in determining the questions in issue." *Casbarian v. District of Columbia*, 134 A.2d 488, 491 (D.C.1957); cf. *Fateh v. Rich*, 481 A.2d 464, 470 (D.C.1984) (opinion testimony of non-expert is admissible if it is "based on the witness' own observations and [is] helpful to the jury," and is not made inadmissible "simply because it embraces an ultimate issue to be decided by the trier of fact" (citations omitted)).

8. Dr. Saiger had testified to Wilkes' limited memory of the circumstances of the crime:

He described, with fair definiteness of recall, events earlier that day which included plans to meet up with the woman who became the victim. He states with ... some emphasis that he does not remember anything beyond going to try to meet her and finding himself later in Virginia, even quite in contrast with the wealth of detail about what he had done earlier. He [was] emphatic when I questioned him about the possibility that he didn't remember because he was intoxicated. He was very insistent that not that day, not any

day did he use alcohol or drugs. But it seems to have been a lapse of memory and consciousness that was unaffected by physical cause and which terminated abruptly some hours later.

Thus, according to Wilkes' statements to Dr. Saiger, the memory lapse lasted from shortly before 5:00 p.m. (when he went to meet Johnetta McLean at work) until "some hours later" (when he found himself in Virginia).

9. The objection was based on two grounds, involuntariness and remoteness. Because the court had previously concluded that the statements were voluntary, that objection was overruled. As to remoteness, the court reasoned that "if the day after the incident [Wilkes] had some memory of what had occurred in the afternoon of the incident, that seems to me to be relevant to the opinions this witness has expressed...." The court therefore overruled this objection as well.

10. Dr. Blumberg agreed with Dr. Saiger that Wilkes might have been afflicted with a dissociative disorder. Dr. Blumberg concluded, however, that it was unlikely that Wilkes had suffered a blackout episode at the time of the crimes because of the amount of "planning, alertness, and mental intactness" involved in their commission.

Wilkes' statements to Sergeant Craig and Detective Vacin, among other things, in arriving at that conclusion. The court gave a limiting instruction after the testimony of each of the two police officers. For example, after Sergeant Craig's testimony, the court told the jury:

Statements of the defendant to the doctor may be discredited or impeached by showing that the defendant has previously made statements which are inconsistent with what he told the doctor.

The prior statement is admitted into evidence solely for your consideration in evaluating the credibility of the defendant's statement to the doctor and the reliability of the opinion which the doctor based in part on those statements.

The defendant's statement to the detective is not considered as evidence of the defendant's guilt of the offense for which he is charged. You may consider it—you may not consider it, rather, as establishing the truth of any facts contained in it, and you must not draw any inference of guilt against the defendant just from his statements.

Another officer, Detective Gary Queen, testified about the search of the area near the drug store and the recovery of the car but not the gun.

Before preparing final jury instructions, the court decided to address once again the admissibility of Wilkes' statements to Sergeant Craig and Detective Vacin. After hearing argument by counsel on this question, the court reiterated its earlier ruling that the statements could be used to rebut Dr. Saiger's diagnosis. The court explained its decision, in part, as follows:

The admission of this evidence provides valuable aid to the jury in assessing the weight of the doctors' opinions which is important to the truth finding process. It is certainly only speculative to suggest that impermissible police conduct would be encouraged by allowing the testimony in.

\*　　\*　　\*　　\*　　\*　　\*

So my conclusion is that this evidence is admissible by analogy to *Harris v.*

*New York,* but it is not the impeaching evidence as such, that is, it is not a matter of defendant's credibility, but it is a matter solely for the jury to take into account in determining what weight to give to the opinions of the various experts.

In its final charge, the court instructed the jury about how it should assess Wilkes' statements to the police:

Now the evidence in this case included the testimony of two detectives concerning various statements that were allegedly made by the defendant on the day of his arrest, May 20, 1989, the day after the offenses charged.

The Government has contended that those statements were not consistent with some of the statements which the expert witnesses say the defendant made to them with respect to the defendant's memory of the events of May 19, 1989. Again, it is for you to determine whether the statements were consistent or not.

The detectives' testimony in this regard is admitted into evidence solely for your consideration in evaluating the weight to be given to the experts' opinions on the question of the defendant's sanity, insofar as those expert opinions may have been based in part upon the defendant's statement to the experts.

You are not to consider the two detectives' testimony at all in determining whether the Government has established beyond a reasonable doubt that the defendant committed the acts constituting the alleged offenses.

Only if you first determine without considering their testimony that the Government has proven every element of the offenses charged beyond a reasonable doubt, so that you then must go on to consider the defense of insanity, may you then consider the testimony of two detectives in determining whether or not the defendant is not guilty by reason of insanity.

## II

Wilkes contends that the use of his statements to the police to rebut the diagnosis of his expert violated his Fifth Amendment privilege against self-incrimination, and that he is therefore entitled to a new trial. The government argues, on the other hand, that the Fifth Amendment is simply not implicated in the determination of a defendant's sanity.[11] For two reasons, we cannot accept the government's argument. First, the validity of its underlying premise is suspect. See Estelle v. Smith, 451 U.S. 454, 465, 101 S.Ct. 1866, 1874, 68 L.Ed.2d 359 (1981). Second, the cases relied upon by the government address a factually and legally distinguishable issue, namely, the constitutionality of the use of statements made during compelled psychiatric examinations.[12] Thus we must consider in this case whether the admission of Wilkes' statements, concededly taken in violation of Miranda, for the purpose of rebutting his expert's opinion on the issue of his sanity violated his rights under the Fifth Amendment.

In Walder v. United States, 347 U.S. 62, 74 S.Ct. 354, 98 L.Ed. 503 (1954), the Supreme Court created a narrow exception to its earlier holding in Agnello v. United States, 269 U.S. 20, 46 S.Ct. 4, 70 L.Ed. 145 (1925), in which the Court had reiterated the rule that illegally seized evidence must be excluded for all purposes. "The essence of a provision forbidding the acquisition of evidence in a certain way is not merely that evidence so acquired shall not be used before the Court but that it shall not be used at all." Silverthorne Lumber Co. v. United States, 251 U.S. 385, 392, 40 S.Ct. 182, 183, 64 L.Ed. 319 (1920), quoted in Agnello, 269 U.S. at 35, 46 S.Ct. at 7; see also Weeks v. United States, 232 U.S. 383, 34 S.Ct. 341, 58 L.Ed. 652 (1914). Despite the exclusionary rule, however, the Court in Walder allowed the government to introduce unlawfully seized evidence to rebut Walder's perjured testimony.

Walder had been previously arrested for purchasing and possessing heroin, but on that occasion a court had suppressed the seized narcotics on the ground that their seizure had violated his Fourth Amendment rights. The government thereupon dismissed its case. Two years later Walder was arrested again on similar charges. At the trial in the second case, he testified in his own defense and categorically denied ever having sold, distributed, or even possessed narcotics. The trial court allowed the government to impeach Walder on cross-examination with questions about the drugs seized from his home in the previously dismissed case. It was beyond dispute that the Constitution barred the use of illegally seized evidence to secure a conviction. See 347 U.S. at 64–65, 74 S.Ct. at 355–356 (citing Silverthorne and Weeks). Accordingly, the Supreme Court said, Walder had a right to "deny all the elements of the case against him without giving leave to the Government to introduce by way of rebuttal evidence illegally secured by it, and therefore not available for its case in chief." Id. at 65, 74 S.Ct. at 3. But Walder's sweeping denial of any prior involvement with illegal drugs, a matter collateral to the charged offenses, went too far. In upholding the admission of the evidence about the earlier drug case and affirming Walder's conviction, the Supreme Court held that the exclusionary rule did not justify "letting the defendant affirmatively resort to perjurious testimony in reliance on the Government's disability to challenge his credibility." Id. (footnote omitted). The Court explained:

It is one thing to say that the Government cannot make an affirmative use of evidence unlawfully obtained. It is quite another to say that the defendant can turn the illegal method by which evidence in the Government's possession

---

11. See, e.g., White v. United States, 451 A.2d 848, 852 (D.C.1982); Hargrave v. Wainwright, 804 F.2d 1182, 1190–1192 (11th Cir.1986), rev'd on other grounds on rehearing en banc, 832 F.2d 1528 (1987), cert. denied, 489 U.S. 1071, 109 S.Ct. 1353, 103 L.Ed.2d 821 (1989).

12. E.g., Buchanan v. Kentucky, 483 U.S. 402, 107 S.Ct. 2906, 97 L.Ed.2d 336 (1987); United States v. Hinckley, 217 U.S.App.D.C. 262, 279 n. 116, 672 F.2d 115, 132 n. 116 (1982).

was obtained to his own advantage, and provide himself with a shield against contradiction of his untruths. Such an extension of the *Weeks* doctrine would be a perversion of the Fourth Amendment.

*Id.*

The *Walder* impeachment exception was first applied in the context of a *Miranda* violation in *Harris v. New York*, 401 U.S. 222, 91 S.Ct. 643, 28 L.Ed.2d 1 (1971). The defendant in *Harris* was impeached at trial with statements he had made to the police, taken in violation of *Miranda*, after he had testified in his own defense and had denied committing the crimes with which he was charged. The Court upheld the impeachment, ruling that evidence barred under *Miranda*, though unavailable to the government in its case in chief, need not be barred for all purposes. While *Walder* was limited by its facts to the permissibility of impeachment on collateral matters, the Court in *Harris* saw no "difference in principle" requiring it to reach a different result simply because the challenged impeachment bore directly on the defendant's guilt. 401 U.S. at 225, 91 S.Ct. at 645.

> Every criminal defendant is privileged to testify in his own defense, or to refuse to do so. But that privilege cannot be construed to include the right to commit perjury.... The shield provided by *Miranda* cannot be perverted into a license to use perjury by way of a defense, free from the risk of confrontation with prior inconsistent statements.

*Id.* at 225–226, 91 S.Ct. at 645–646 (citations omitted). The Court explicitly rejected the argument that the policies underlying the exclusionary rule, without more, were of sufficient force to carry the day:

> The impeachment process here undoubtedly provided valuable aid to the jury in assessing petitioner's credibility, and the benefits of this process should not be lost, in our view, because of the speculative possibility that impermissible police conduct will be encouraged thereby. Assuming that the exclusionary rule has a deterrent effect on proscribed police conduct, sufficient deterrence flows when the evidence in question is made unavailable to the prosecution in its case in chief.

*Id.* at 225, 91 S.Ct. at 645.

The impeachment exception evolved further in the Court's decisions in *Oregon v. Hass*, 420 U.S. 714, 95 S.Ct. 1215, 43 L.Ed.2d 570 (1975), and *United States v. Havens*, 446 U.S. 620, 100 S.Ct. 1912, 64 L.Ed.2d 559 (1980). In *Hass* statements made by the defendant after he was properly advised of his *Miranda* rights, but was told that he could not speak with an attorney until later, were excluded from the prosecution's case in chief. After Hass testified in his own defense, directly contradicting the substance of the excluded statements, the prosecutor was allowed to call a police officer on rebuttal to testify about those statements even though they had previously been suppressed. The Supreme Court expressly pointed out that Hass' contradictory testimony was made after he knew the officer's testimony would be excluded. As in *Harris*, the Court held that "the shield provided by *Miranda* is not to be perverted to a license to testify inconsistently, or even perjuriously, free from the risk of confrontation with prior inconsistent utterances." 420 U.S. at 722, 95 S.Ct. at 1220. Similarly, in *Havens* the trial court had permitted the introduction of illegally seized evidence (a T-shirt which had been used to conceal cocaine) to impeach the defendant's credibility with respect to statements he had made on cross-examination about the T-shirt. The Court found no reason to distinguish the case before it from *Walder, Harris,* and *Hass:*

> In terms of impeaching a defendant's seemingly false statements with his prior inconsistent utterances or with other reliable evidence available to the government, we see no difference of constitutional magnitude between the defendant's statements on direct examination and his answers to questions put to him on cross-examination that are plainly within the scope of the defendant's direct examination. Without this opportunity, the normal function of cross-examination would be severely impeded.

446 U.S. at 627, 100 S.Ct. at 1916.

The Supreme Court's next significant decision on the scope of the impeachment

exception was *James v. Illinois*, 493 U.S. 307, 110 S.Ct. 648, 107 L.Ed.2d 676 (1990), in which one group of teenagers was robbed by another group of teenagers. One person was killed and another was seriously injured when a member of the first group fired a gun into the second group. The next day the police arrested fifteen-year-old Darryl James for the shooting. At the time of his arrest, James was sitting under a hair dryer in his mother's beauty parlor. His hair was black and curly when he was arrested, but he acknowledged to the police that on the previous day it was reddish-brown and was combed straight. In response to police questioning, James stated that he had dyed and curled his hair to change his appearance. These statements were excluded at trial because they were the product of an arrest without probable cause and therefore were taken in violation of James' rights under the Fourth Amendment.

At trial James was positively identified by several members of the rival group even though, according to their testimony, his hair had been "reddish" and "slicked back" at the time of the shooting. He did not testify in his own defense. However, the defense did call a witness who testified, contrary to the state's witnesses, that on the day of the shooting James' hair had been black and curly. The prosecutor, over objection, was permitted to impeach the credibility of this witness with James' illegally obtained statements to the police. In its rebuttal case, the state presented testimony from a detective about James' statements, and he was ultimately convicted on both charged counts. The Supreme Court reversed.[13]

■ In the very first paragraph of its opinion, the Supreme Court in *James* made clear that the holding of the case should be read as a response to a state court's effort to create an exception to the exclusionary rule so broad that it virtually swallowed the rule. The Court said:

The impeachment exception to the exclusionary rule permits the prosecution in a criminal proceeding to introduce illegally obtained evidence to impeach the defendant's own testimony. The Illinois Supreme Court extended this exception to permit the prosecution to impeach the testimony of *all* defense witnesses with illegally obtained evidence.... Finding this extension inconsistent with the balance of values underlying our previous applications of the exclusionary rule, we reverse.

493 U.S. at 309, 110 S.Ct. at 650 (emphasis in original; citation omitted). Seizing on the italicized word *"all,"* Wilkes contends that the Court barred impeachment of *"all* defense witnesses," other than the defendant himself, with excluded evidence. Under Wilkes' reading of *James*, it was improper for the trial court in this case to admit his excluded statements to the police to rebut Dr. Saiger's opinion about his mental condition.

We conclude that Wilkes, in urging this wooden interpretation of *James*, misconstrues that decision. Wilkes assumes from his reading of the phrase *"all* defense witnesses" that only a defendant can be impeached by excluded evidence. *James* does not sweep so broadly. We think it more reasonable, and far less dramatic, to read *James* as principally rejecting an overly broad principle rather than establishing one of its own. The Court explained in *James* that "the truth-seeking rationale ... of *Walder* and its progeny does not apply to other witnesses [*i.e.,* defense witnesses other than the defendant] with equal force." *Id.* at 317, 110 S.Ct. at 654. We read this language as nothing more than a rejection of the idea that *"all* defense witnesses" can be treated as a homogeneous group for the purpose of determining the scope of the impeachment exception. Thus the Court makes clear that there is no shorthand way to apply to *"all* defense witnesses" *en masse* the balancing approach that is crucial to the impeachment exception. The

13. The Illinois Appellate Court reversed James' convictions after concluding that the admission of the suppressed statements was improper. *People v. James,* 153 Ill.App.3d 131, 505 N.E.2d 1118, 106 Ill.Dec. 327 (1987). The Illinois Supreme Court reversed the Appellate Court and reinstated the judgment of conviction. *People v.*

Illinois court erred in doing so, but the Supreme Court engaged in a balancing process which must guide our decision in the present case as well.

Balancing the truth-seeking function of a trial with the deterrent function of the exclusionary rule, the *James* Court concluded that the broad exception to the exclusionary rule espoused by the Illinois Supreme Court would do more violence to the latter than it would benefit the former. In reaching this conclusion, the Court emphasized that the purpose of the impeachment exception is to discourage defendants "in the first instance from 'affirmatively resort[ing] to perjurious testimony.'" *Id.* at 314, 110 S.Ct. at 652 (quoting *Walder, supra*, 347 U.S. at 65, 74 S.Ct. at 356). The exception enables defendants to testify truthfully and avoid admission of the suppressed evidence, provided they do not open the door by contradicting the suppressed evidence. Hence the impeachment exception, properly applied, accommodates competing societal and individual interests. The Court did not see similar benefits flowing from the significantly expanded version of the impeachment exception adopted by the Illinois Supreme Court. In fact, it found that such expansion would be detrimental because it would both chill a defendant's ability to present a competent defense [14] and significantly weaken the exclusionary rule's deterrent effect on police misconduct.[15]

*Walder* and its progeny have emphasized and re-emphasized "the importance of arriving at truth in criminal trials"[16] as a central factor in determining the proper scope of the impeachment exception following a violation of *Miranda.* For example, in *Havens* the Court wrote:

> There is no gainsaying that arriving at the truth is a fundamental goal of our legal system. We have repeatedly insisted that when defendants testify, they must testify truthfully or suffer the consequences.... This is true even though a defendant is compelled to testify against his will.... It is essential, therefore, to the proper functioning of the adversary system that when a defendant takes the stand, the government be permitted proper and effective cross-examination in an attempt to elicit the truth.

446 U.S. at 626–627, 100 S.Ct. at 1916 (citations omitted); *see also Oregon v. Hass, supra*, 420 U.S. at 722, 95 S.Ct. at 1220; *Harris v. New York, supra*, 401 U.S. at 225, 91 S.Ct. at 645. This theme is echoed in later cases as well. *See, e.g., Illinois v. Krull*, 480 U.S. 340, 347, 107 S.Ct. 1160, 1165, 94 L.Ed.2d 364 (1987) (courts must consider "costs of withholding reliable information from the truth-seeking process" in evaluating proposed exceptions to the exclusionary rule); *Jenkins v. Anderson*, 447 U.S. 231, 238, 100 S.Ct. 2124, 2129, 65 L.Ed.2d 86 (1980) ("Once a defendant decides to testify, '[t]he interests of the other party and regard for the function of the courts of justice to ascertain the truth become relevant, and prevail in the balance of considerations determining the scope and the limits of the privilege against self-incrimination'" (citation omitted)). Most recently, in *Michigan v. Harvey*, 494 U.S. 344, 110 S.Ct. 1176, 108 L.Ed.2d 293

---

*James*, 123 Ill.2d 523, 528 N.E.2d 723, 124 Ill. Dec. 35 (1988).

**14.** The Court theorized that such a rule could chill a defendant's ability to present his or her best defense because the defendant would have to weigh the risk of calling a witness who, although able to "offer truthful and favorable testimony," *might somehow inadvertently open* the door to the admission of the excluded evidence while giving that testimony. 493 U.S. at 315, 110 S.Ct. at 653. The Court suggested further that the government might "brandish such evidence as a sword with which to dissuade defendants from presenting a meaningful defense through other witnesses." *Id.* at 317, 110 S.Ct. at 654.

**15.** The Court feared that such deterrence would be reduced because the Illinois Supreme Court's holding would "vastly increase the number of occasions on which such evidence could be used." 493 U.S. at 318, 110 S.Ct. at 654. The Court perceived as well that the police "would recognize that obtaining evidence through illegal means stacks the deck heavily in the prosecution's favor" and that it would become "far more than a 'speculative possibility' that police misconduct will be encouraged by permitting such use of illegally obtained evidence." *Id.*

**16.** *United States v. Havens, supra*, 446 U.S. at 626, 100 S.Ct. at 1916.

(1990)—decided two months after *James v. Illinois*—the Court declared:

> We have *never* prevented use by the prosecution of relevant voluntary statements by a defendant, particularly when the violations alleged by a defendant relate only to procedural safeguards that are "not themselves rights protected by the Constitution" ... but are instead measures designed to ensure that the constitutional rights are protected. In such cases, we have decided that the "search for truth in a criminal case" outweighs the "speculative possibility" that exclusion of evidence might deter future violations of rules not compelled directly by the Constitution in the first place.

*Id.* at 351–352, 110 S.Ct. at 1180–1181 (citations omitted; emphasis added).

### III

■ Thus directed by the Supreme Court to strike a balance between the truth-seeking function of a trial and the deterrent function of the exclusionary rule,[17] we conclude that the trial court here did not commit error in permitting Wilkes' expert to be questioned about Wilkes' statements. That expert, Dr. Saiger, had recounted in detail what Wilkes had told him (see note 8, *supra*), and on cross-examination he testified that he had based his diagnosis "in large part" on Wilkes' statements to him that he had no memory of the shootings.[18] The doctor conceded that if Wilkes did remember what happened on May 19 "and lied when he said he didn't, the diagnosis would definitely be reconsidered." Thus the excluded statements, directly contradicting what Wilkes had told Dr. Saiger, provided the most relevant information available with which to probe the factual basis of Dr. Saiger's opinion. We hold that the truth-seeking function of this trial "was better served by [allowing Dr. Saiger to be cross-examined about the statements] than the

deterrent function would have been by [their] exclusion." *Martinez v. United States, supra* note 17, 566 A.2d at 1059.

The truth-seeking process would be frustrated even further by excluding the testimony of the three government experts, which Wilkes also seeks, at least in part. The testimony of each was premised to a considerable extent on the excluded statements. If that testimony were kept from the jury, none of these experts—who were charged with responsibility for assessing Wilkes' mental condition at the time of the crimes—would be able to form an opinion based on information which Dr. Saiger conceded was critical to an accurate diagnosis. We do not think the truth-seeking function of a trial would be served, even marginally, if the medical experts on either side of the case were required to render opinions on complicated issues of mental disability while ignorant of facts essential to a valid diagnosis. Such a result would be beyond the pale of reasonableness and is certainly not mandated by the Fifth Amendment or the decisions of the Supreme Court.

Moreover, as the Court emphasized in *James*, an important purpose of the impeachment exception is to discourage defendants "in the first instance from 'affirmatively resort[ing] to perjurious testimony.'" 493 U.S. at 314, 110 S.Ct. at 652 (quoting *Walder, supra*, 347 U.S. at 65, 74 S.Ct. at 356). Such discouragement is best achieved here by upholding the admission of Wilkes' statements. Obviously, no one can be 100 percent certain whether Wilkes' apparent mental disorder is feigned or real. Nevertheless, this is probably the only situation (we can think of no other) in which the threat of a perjury prosecution is of no value. A doctor who accurately recounts what his patient has told him, and in so doing properly discloses to the fact-finder the basis for his opinion, does not commit perjury simply by relating untruths told to

---

**17.** *See Martinez v. United States,* 566 A.2d 1049, 1055–1056 (D.C.1989) ("case-by-case balancing" required), *cert. denied,* 498 U.S. 1030, 111 S.Ct. 685, 112 L.Ed.2d 677 (1991); *Tate v. United States,* 109 U.S.App.D.C. 13, 15, 283 F.2d 377, 379 (1960).

**18.** *See People v. Finkey,* 105 Ill.App.3d 230, 434 N.E.2d 18, 61 Ill.Dec. 81 (1982) (concluding, on similar facts, that defendant's remarks were "extremely relevant" and therefore admissible).

him by his patient. Thus this case is readily distinguishable from *James*, for example, in which the Court recognized that most defense witnesses (other than the defendant) are sufficiently deterred from committing perjury by the threat of being prosecuted for it. No analogous threat hangs over the head of a defendant who knows that his untruths will simply be relied upon and repeated to the jury on his behalf by his psychiatrist.

For much the same reason, this case is also distinguishable from *United States v. Hinckley*, 217 U.S.App.D.C. 262, 672 F.2d 115 (1982), on which Wilkes also relies. Hinckley was questioned, despite a request for an attorney, by agents of the Federal Bureau of Investigation following his attempted assassination of President Reagan. The trial court suppressed statements which Hinckley gave to those agents, as well as testimony about Hinckley's demeanor during the interrogation. The government appealed from the suppression of this evidence, arguing in part that it should be admissible in rebuttal on the issue of Hinckley's sanity. The Court of Appeals disagreed. It held that to allow the use of this illegally obtained evidence, even in rebuttal, "would do wholesale violence to the rationale of [the Supreme Court's impeachment exception] decisions and the underlying purposes of the fourth and fifth amendments." *Id.* at 280, 672 F.2d at 133. In reaching this conclusion, however, the court emphasized the particular fact that the FBI was involved and its concern that these specially trained agents would not be deterred by a less than total ban on the use of illegally obtained evidence.[19]

Nor are we persuaded that allowing statements which have been excluded under *Miranda* to be used for rebutting an insanity defense would chill a defendant's ability to raise the best defense available. A defendant may still avoid admission of the suppressed evidence if he or she does not open the door by telling something to a

psychiatrist that is contradicted by that evidence. In this regard, the application of the impeachment exception which we uphold in this case is simply not of the same breadth, and consequently cannot be charged with the same infirmities, as the broad rule adopted by the Illinois court and rejected by the Supreme Court in *James*. Our holding is limited to the factual context of a case such as this, in which the defendant offers the testimony of a psychiatrist (or other expert) to support an insanity defense. We do not think that such a defendant should be allowed to lie to the psychiatrist and get away with it when there is evidence tending to show that he lied *and that the psychiatrist's diagnosis was based on that lie.*

Finally, we do not believe that our decision today will encourage improper police conduct to an extent that would offset the benefits to the truth-seeking process. The Supreme Court has made clear that "the speculative possibility that impermissible police conduct will be encouraged" is an insufficient predicate upon which to hold that the Fifth Amendment was violated. *Oregon v. Hass, supra,* 420 U.S. at 722–723, 95 S.Ct. 1220–1221; *accord, Michigan v. Harvey, supra,* 494 U.S. at 352, 110 S.Ct. at 1181 (reaffirming *Hass* ); *United States v. Havens, supra,* 446 U.S. at 627, 100 S.Ct. at 1916 (same). Police misconduct is not likely to increase as a result of our decision today because the police have no way of knowing, at the time someone is arrested and questioned, whether an insanity defense will be raised much later at the suspect's trial. Even if the police, at this preliminary stage of the case, could guess that such a defense might be possible, it would be unreasonable to expect that they would violate the suspect's rights by engaging in misconduct based on such a "speculative possibility."

Summing up, we hold that when a defendant offers the testimony of an expert in the course of presenting an insanity defense and the expert's opinion is based, to

---

**19.** In any event, *Hinckley* is not binding on this court. *See M.A.P. v. Ryan,* 285 A.2d 310, 312 (D.C.1971).

any appreciable extent, on statements made to the expert by the defendant, the government may offer evidence excluded under *Miranda*—either by way of impeachment (*i.e.*, during cross-examination of the expert) or in rebuttal (*i.e.*, by showing independently that the statements made to the expert were false)—for consideration by the fact-finder in assessing the expert's opinion. That is all that happened in this case, and accordingly Wilkes' convictions are

*Affirmed.*

FARRELL, Associate Judge, dissenting:

The government's position in this case, broadly read, is that when the prosecution has proven all of the elements of the charge beyond a reasonable doubt and the defendant then attempts to disprove his sanity at the time of the offense through psychiatric witnesses, the exclusionary rule should not bar the prosecutor from testing the foundation of the witnesses' conclusions by asking them to consider voluntary statements taken from the defendant shortly after the offense, though in violation of *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). Moreover, rebuttal psychiatric witnesses for the government, in forming their opinion of the defendant's sanity, and even though permitted to examine the defendant pretrial, *see Buchanan v. Kentucky*, 483 U.S. 402, 107 S.Ct. 2906, 97 L.Ed.2d 336 (1987), should not be denied access to potentially some of the most probative evidence bearing on his mental condition in the form of statements, otherwise excludable, which he made to the police more or less contemporaneously with the crime. A defendant guilty but insane (conceptually no different than one not guilty by reason of insanity) may not be punished criminally, but the intensely medical question of whether he is accountable volitionally for his acts—despite his factual guilt—should be decided upon all of the evidence available, including

statements obtained contrary to *Miranda's* prophylactic rules.

This is by no means a frivolous position.[1] But, as the government concedes, a broad argument that *Miranda's* exclusionary rule should not apply to the insanity defense (*i.e.*, beyond the "guilt" phase of trial) would have to overcome *Estelle v. Smith*, 451 U.S. 454, 101 S.Ct. 1866, 68 L.Ed.2d 359 (1980). Moreover, immunizing this class of cases from suppression for *Miranda* violations undoubtedly lowers the incentive to police to respect an arrestee's constitutional right to silence when, for example, the bizarre nature of the criminal conduct suggests the strong likelihood of an insanity defense. *E.g., United States v. Hinckley*, 217 U.S.App.D.C. 262, 672 F.2d 115 (1982). The government therefore advances a narrower argument—but still one drawing from the peculiarity of the insanity defense—that under the *Walder, Harris, Hass*, and *Havens* line of cases, discussed by the majority, a defendant should not be able to place his own version of his mental state at the time of the offense before the jury through the testimony of defense psychiatric witnesses without the government being able to confront those witnesses with other statements he has made that may present a very different picture, and even affect their opinion. It is this argument, as I understand it, that the majority accepts.

However one might judge this argument if we were writing on a clean slate, I believe it is foreclosed by *James v. Illinois*, 493 U.S. 307, 110 S.Ct. 648, 107 L.Ed.2d 676 (1990). *James*, of course, was not an "insanity" case. Nonetheless, I do not think *James* can fairly be read as rejecting only a *categorical* rule that the impeachment exception of *Walder* and its progeny applies alike to defense witnesses and testifying defendants—but leaving open case-by-case application of the exception to defense witnesses (other than the defendant) in particular contexts, such as the insanity defense.

1. *Compare, e.g.,* Comment, *The Use of Illegally Obtained Evidence to Rebut the Insanity Defense: A New Exception to the Exclusion Rule,* 74 J.Crim.L. & Criminol. 391 (1983) *with* Comment, *Fifth Amendment Limitations on the Use of Police Testimony to Rebut the Insanity Defense,* 58 U.Chi.L.Rev. 359 (1991).

In *James,* the Illinois Supreme Court had concluded that,

in order to deter the defendant from engaging in perjury "by proxy," the impeachment exception to the exclusionary rule ought to be expanded to allow the State to introduce illegally obtained evidence to impeach the testimony of defense witnesses *other than the defendant himself.*

*James,* 493 U.S. at 311, 110 S.Ct. at 651 (emphasis added). The United States Supreme Court narrowly (5–4) rejected this conclusion. It is true that, at the beginning of its opinion, the Court summarized the holding of the Illinois court as "extend[ing the impeachment] exception to permit the prosecution to impeach the testimony of *all* defense witnesses with illegally obtained evidence." *Id.* at 309, 110 S.Ct. at 650 (emphasis by Supreme Court). But what the Court meant by "all" is made clear by the rest of the opinion, beginning with the summary of the state court's conclusion quoted above: *"all* defense witnesses" means "witnesses other than the defendant himself." The Court later summed up the Illinois decision again as holding "that our balancing approach in *Walder* and its progeny justifies expanding the scope of the impeachment exception to permit prosecutors to use illegally obtained evidence to impeach the credibility *of defense witnesses." Id.* at 313, 110 S.Ct. at 652 (emphasis added). The Court replied: "We disagree." It went on to explain why "the truth-seeking rationale supporting the impeachment of defendants in *Walder* and its progeny does not apply *to other witnesses* with equal force." *Id.* at 317, 110 S.Ct. at 654 (emphasis added). Moreover, in discussing the purpose of the exclusionary rule to deter police misconduct, the Court compared the situation addressed by *Harris*—where "[l]aw enforcement officers will think it unlikely that *the defendant* will first decide to testify at trial and will also open the door inadvertently to admission of any illegally obtained evidence"— with the proposed expansion of "the impeachment exception to *all* defense witnesses," *id.* at 318, 110 S.Ct. at 654 (latter emphasis by Court); the latter would "vast-

ly increase the number of occasions on which such evidence could be used," since, for example, "[d]efense witnesses easily outnumber testifying defendants...." *Id.* The Court concluded that "[o]ur previous recognition of an impeachment exception *limited to the testimony of defendants* reflects a careful weighing of the competing values." *Id.* at 320, 110 S.Ct. at 655 (emphasis added). The Court thus "adhere[d] to the line drawn in our previous cases" rather than "expanding the exception to encompass the testimony of all defense witnesses." *Id.* The four dissenting Justices, unsurprisingly, saw the majority as "adopt[ing] a sweeping rule that the testimony of witnesses other than the defendant may never be rebutted with excludable evidence." *Id.* at 324, 110 S.Ct. at 657 (Kennedy, J., dissenting).

If, as the majority concludes here, the Supreme Court in *James* was merely rejecting the notion "that '*all* defense witnesses' can be treated as a homogeneous group for the purpose of determining the scope of the impeachment exception," *ante* at 887, one might have expected it—before reversing the judgment of the Illinois Supreme Court—to explain why impeachment of the particular defense witness in *James,* or impeachment of that particular sub-class of witnesses, was improper; yet the Court's legal discussion is all but silent about the particular impeachment of the defense witness in that case. Similarly, if the Court were only rejecting "an overly broad principle" announced by the Illinois court "rather than establishing one of its own," *ante* at 887, one might have expected it to make clear that on remand the Illinois court was free to engage in a more focused or particularized balancing and conceivably still hold that the impeachment of the defense witness in that case was proper. Instead the Court, succinctly, held "that the Illinois Supreme Court erred in affirming James' convictions despite the prosecutor's use of illegally obtained statements to impeach a defense witness' testimony." 493 U.S. at 320, 110 S.Ct. at 655. There is no suggestion that on the ordered remand "for further proceedings not inconsistent with this

opinion," *id.*, the state court was free to uphold the challenged impeachment if it could fairly place the witness in a narrower category than "all defense witnesses."

In short, I do not believe the Supreme Court has left it open to us "to strike a balance between the truth-seeking function of a trial and the deterrent function of the exclusionary rule," *ante* at 889, each time the prosecution desires to impeach a defense witness (other than the defendant) with illegally obtained evidence.[2] Were we free to conduct that balancing, I might agree with the majority that the deterrent effect of a perjury charge—stressed in *James*—has little application to "a defendant who knows that his untruths will simply be relied upon and repeated to the jury on his behalf by his psychiatrist." *Ante* at 890.[3] In other respects too impeachment of a psychiatric witness may present a special case. But I believe *James* forecloses this sort of case-by-case balancing of interests where proposed impeachment of a witness other than the defendant is involved.

The government implies that, given the psychiatrist's reliance on appellant's statements and transmittal of them to the jury, this case is really about impeachment of the defendant himself rather than a defense witness. That argument differs only in degree, not kind, from the "proxy" theory rejected in *James, see* 493 U.S. at 311, 110 S.Ct. at 651. Appellant's statements to his psychiatrist have little significance *except* as they formed a vital part of the basis for the expert's conclusion,[4] a fact the trial judge recognized in admitting appellant's statements to the police only for their effect upon the weight of the psychiatrist's conclusion. This was classic impeachment of a witness other than the defendant.

The categorical distinction *James* draws between defendant testimony and testimony of defense witnesses is itself debatable. *See* J.L. Kainen, *The Impeachment Exception to the Exclusionary Rules: Policies, Principles, and Politics*, 44 STANFORD L.REV. 1301, 1312–21 (1992). But, for the reasons stated, *James* leaves no doubt that the government's recourse in defending the impeachment that took place here lies with the Supreme Court and not the lower courts.

It remains for me to say I do not accept the government's argument (occupying barely 3 pages of its 50–page brief) that any error in the admission of the defendant's *Miranda*-violative statements was harmless under the standard of *Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17

---

**2.** There is no question in this case that appellant's statements to the police were highly relevant; Dr. Saiger made that clear by admitting that if appellant did in fact remember what happened on May 19 "and lied when he said he didn't, the diagnosis would definitely be reconsidered." But I can not distinguish this relevance from the point made by Justice Kennedy in *James*, but which the majority did not find persuasive, that "[t]o deprive the jurors of knowledge that statements of the defendant himself revealed the [defense] witness' testimony to be false [or, as in *Wilkes*, simply but importantly mistaken] would result in a decision by triers of fact who were not just kept in the dark as to excluded evidence, but positively misled." 493 U.S. at 324, 110 S.Ct. at 657 (Kennedy, J., dissenting).

Moreover, I note the Court's recent affirmance that deterrence of police misconduct is not the only goal of the exclusionary rule as applied to *Miranda* violations: "By bracing against 'the possibility of unreliable statements in every instance of in-custody interrogation,'

---

*Miranda* serves to guard against 'the use of unreliable statements at trial.'" *Withrow v. Williams*, — U.S. —, —, 113 S.Ct. 1745, 1753, 123 L.Ed.2d 407 (1993) (citation omitted).

**3.** Appellant, of course, rejects the notion of "psychiatrist as mouthpiece" in insanity cases, pointing out that the very role of the psychiatrist at all faithful to his profession is not to take and "repeat" anything the defendant tells him at face value; indeed, the "truth" of what the defendant tells him may be the very opposite of what the defendant says. In appellant's view, the professional oath and reputation of a medical doctor serve as the equivalent and more of the oath a lay witness (not acting as a "conduit") swears to tell the truth.

**4.** That is why, for example, we readily allow the admission of hearsay statements, generally unreliable, as part of the material on which an expert relied in opining on the mental condition of one whom the government seeks to civilly commit. *In re Melton*, 597 A.2d 892 (D.C.1991) (en banc).

L.Ed.2d 705 (1967), which the government concedes to apply here.