Roderick YOUNG, Appellant,

v.

UNITED STATES, Appellee.

No. 99–CO–1651.

District of Columbia Court of Appeals.

Argued Nov. 23, 2004.
Decided Dec. 16, 2004.

Mitchell S. Baer, Washington, DC, for appellant.

Amanda Williams, Assistant United States Attorney, with whom Roscoe C. Howard, Jr., United States Attorney at the time the brief was filed, and John R. Fisher, Thomas J. Tourish, Jr., Kenneth C. Kohl, and Keri S. Barta, Assistant United States Attorneys, were on the brief, for appellee.

Before FARRELL and WASHINGTON, Associate Judges, and KING, Senior Judge.

FARRELL, Associate Judge:

The ultimate question before us is whether the trial judge had sufficient reason to revoke the probation of appellant (Young) based on evidence that he had murdered his grandmother (a crime for which he had not been tried). In the course of answering this question, we must answer two others: (1) Does the Supreme Court's decision in *Crawford v. Washington*, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004), preclude consideration at a probation revocation hearing of an unavailable codefendant's custodial statement to police implicating the probationer in a crime; and (2) by what standard of proof must the government prove a crime offered as the basis for revoking probation. We affirm the decision to revoke Young's probation.

### I.

Young was convicted in 1995 of possession of a firearm during a crime of violence, an armed robbery; imposition of sentence was suspended and he was placed on probation for five years. In September 1997 he was arrested and charged with the murder of his grandmother, Eddie Mae Taylor. The government dismissed that case after a judge ruled that hearsay statements to the police by Young's codefendant, Marcus Coleman, were inadmissible at Young's trial. But, in the meantime, the government sought to revoke Young's probation based on his involvement in the murder. Following an August 1999 hearing, the trial judge (Duncan–Peters) revoked the probation and sentenced Young to five to fifteen years' imprisonment.

Evidence adduced at the revocation hearing and credited by the trial judge revealed the following. The 78–year–old Ms. Taylor was found dead in her home at 1010 C Street, S.E., on the afternoon of September 22, 1997. Death had occurred between 8:00 p.m. on September 21 and 4:00 a.m. that morning. Ms. Taylor had multiple blunt force wounds to her chest, neck, and head. An empty Citibank, F.S.B. envelope was found on top of her clothes in a dresser drawer in her bed-

room. She had withdrawn a total of $150 from Citibank in the past two months and, according to one of her daughters, Pamela Lewis, always kept her money in the bedroom dresser in a bank envelope. The house had not been ransacked, there was no sign of forced entry, and the front door was unlocked.

Young had previously lived with Ms. Taylor and still had a key to the bottom lock on the front door. (Ms. Taylor, according to another daughter, for a while had used only a key to the bottom lock.) Around the time of her death Young had been in the process of cleaning her windows, thus had spent time in the house. Pamela Lewis also described an incident during the year before the death when $300 from Ms. Taylor's tax refund had disappeared from the bedroom dresser while Young was in the home. After Ms. Taylor told him that "that money better appear back in this house," Young went into the bedroom and came out with the money, claiming his grandmother had not looked carefully enough for it—though Lewis herself had previously looked for it unsuccessfully in the place where Young "found it." On other occasions, Young had also asked Ms. Taylor for money, apparently prompting her anger.

In a statement to the police after the murder, Young admitted that he and Marcus Coleman had been just across the street from Ms. Taylor's house at 2:00 in the morning of September 22. They had gone to 1017 C Street, S.E., to take money from Coleman's mother's beauty shop.[1] While Coleman tried unsuccessfully to enter the shop (he had no key to the top lock), Young said he waited in the car and

noticed that Ms. Taylor's porch light was on; he thought this strange but decided not to go over and knock for fear of awakening her.

In addition to the above evidence, the government was allowed to introduce successive statements that Coleman had made to the police following the murder. In an interview at the police station on September 23, Coleman explained that he and Young had gone to his mother's store on C Street to get "goodies" and that Young waited in the car. When a detective commented that it seemed a coincidence that the two were across the street on the night Ms. Taylor died, Coleman responded that Young in fact had gone into Ms. Taylor's house and that when he returned to the car, he looked sad and said that his grandmother had slipped, fallen, and hurt herself while he was on his way out the door. A day or so later, after being arrested for a probation violation of his own,[2] Coleman gave a more detailed statement incriminating Young (and, to a much lesser degree, himself) in the murder. Young, he said, had asked him to take him to Ms. Taylor's house that evening, saying "it would be easier to sneak in the house at that time to get money." After they drove to C Street in Coleman's father's car and Coleman was unable to enter his mother's shop, he returned to the car but saw that Young had gone into his grandmother's house through the front door. A few minutes later Young returned to the car with his keys in his hand, looking sad. He told Coleman that he had gone into Ms. Taylor's bedroom where she kept her money in a drawer, that she had been asleep but woke up, and that she followed him downstairs yelling at

---

1. Young made a similar admission to his father that he had gone with Coleman to the 1000 block of C Street, S.E., at 2:00 a.m. intending to sneak into Ms. Coleman's beauty parlor and take some money.

2. Coleman had been Young's codefendant in the underlying 1995 case and had likewise received a suspended sentence in favor of probation.

him. He went out back, obtained a brick, and beat her with it before leaving the house with $150 he had taken from the drawer. On the way home, he showed Coleman a bundle of $10 bills.

Coleman did not testify at Young's revocation hearing because he had asserted his privilege against self-incrimination.

## II.

 Young contends first that Coleman's "presumptively unreliable" statements to the police while in custody, *see Lee v. Illinois,* 476 U.S. 530, 545, 106 S.Ct. 2056, 2064, 90 L.Ed.2d 514 (1986), could not constitutionally be admitted into evidence against Young at his probation revocation hearing. He relies principally on the Supreme Court's recent decision in *Crawford, supra,* which held inadmissible, absent a showing of both "unavailability and a prior opportunity for cross-examination [of the declarant]," similar "core testimonial statements" made to the police by a codefendant who was in custody. *Crawford,* 124 S.Ct. at 1371, 1374. *Crawford,* however, and Sixth Amendment principles generally, do not govern this case. *Crawford* was the Court's latest interpretation of the Sixth Amendment's command that "'[i]n all *criminal prosecutions,* the accused shall enjoy the right... to be confronted with the witnesses against him.'" *Id.* at 1357 (emphasis added). Substantially disavowing its prior test for Sixth Amendment admissibility in *Ohio v. Roberts,* 448 U.S. 56, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980), the Court rejected the notion that "a general reliability exception" permits the introduction of uncross-examined "*testimonial* statements against the accused in a *criminal* case." *Id.* at 1367, 1371 (emphasis in original).[3] The inapplicability of *Crawford* to probation revocation hearings is clear. "Probation revocation... is not a stage of a criminal prosecution," *Gagnon v. Scarpelli,* 411 U.S. 778, 782, 93 S.Ct. 1756, 36 L.Ed.2d 656 (1973), and so "the full panoply of rights due a defendant [in a criminal prosecution]" does not apply to such revocation proceedings. *Morrissey v. Brewer,* 408 U.S. 471, 480, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972) (parole revocation); *see Gagnon,* 411 U.S. at 782, 93 S.Ct. 1756 (applying same principle to probation revocation). Rather, probation revocation "'is more in the nature of an administrative hearing concerned with the probationer's rehabilitation.'" *Harris v. United States,* 612 A.2d 198, 201 (D.C.1992) (quoting *Short v. United States,* 366 A.2d 781, 785 (D.C.1976)); *see also Merle v. United States,* 683 A.2d 755, 760 n. 3 (D.C.1996). Thus, while the Confrontation Clause [of the Sixth Amendment] dictates "the manner in which witnesses give testimony in criminal trials," *Crawford,* 124 S.Ct. at 1359—"command[ing], not that evidence be reliable, but that reliability be assessed ... by testing in the crucible of cross-examination," *id.* at 1370—probation revocation is governed by "the minimum requirements of due process," *Morrissey,* 408 U.S. at 489, 92 S.Ct. 2593, a "process ... flexible enough to consider evidence including letters, affidavits, and other material that would not be admissible in an adversary criminal trial." *Id.*[4] Other courts

---

**3.** Although the Court "spell[ed] out [no] comprehensive definition of 'testimonial,'" *Crawford,* 124 S.Ct. at 1374, it held that "[s]tatements taken by police officers in the course of interrogations are ... testimonial under even a narrow [definition of the term]." *Id.* at 1364. The government does not dispute that Coleman's statements were testimonial in this sense.

**4.** *See also Black v. Romano,* 471 U.S. 606, 610, 105 S.Ct. 2254, 85 L.Ed.2d 636 (1985) ("The Due Process Clause of the Fourteenth Amendment imposes procedural and substantive limits on the revocation of the conditional

have recognized the inapplicability of *Crawford* to probation revocation or its equivalent. *See Jenkins v. State,* 2004 Del. Lexis 549 (Del.2004) (probation revocation); *United States v. Martin,* 382 F.3d 840, 844 (8th Cir.2004) (supervised release revocation); *United States v. Barraza,* 318 F.Supp.2d 1031, 1035 (S.D.Cal.2004) (same).

■ Due process, of course, gives the probationer at a revocation hearing a qualified right "to confront and cross-examine adverse witnesses (unless the hearing officer specifically finds good cause for not allowing confrontation)." *Morrissey,* 408 U.S. at 489, 92 S.Ct. 2593; *see Gagnon,* 411 U.S. at 782–83 & n. 3, 93 S.Ct. 1756. Young does not dispute, however, that Judge Duncan–Peters specifically and correctly found Coleman to be unavailable for confrontation because he had invoked his privilege against self-incrimination. In light of that finding, "all that [was] required to make [Coleman's statements] admissible [was] that [they] be reliable." *Merle,* 683 A.2d at 760 n. 3. *See Harris,* 612 A.2d at 201–02; *Patterson v. United States,* 570 A.2d 1198, 1199 (D.C.1990) ("Consistent with the view that judges in probation revocation cases should have access to all reliable information,... reliable hearsay evidence is admissible in probation revocation hearings.").[5]

■ Young argues, nevertheless, that *Crawford* reinforces the Supreme Court's previous recognition that statements such as those admitted here are "presumptively unreliable," *see Lee,* 476 U.S. at 545, 106 S.Ct. 2056 (noting "presumptive[ ] unreliab[ility]" of parts of codefendant's confession "detailing the defendant's ... culpability because those passages may well be the product of the codefendant's desire to shift or spread blame, curry favor [etc.]"), and Young asks how that can be so for purposes of a criminal trial but not of probation revocation—when "[t]he concept of reliability does not change with the nature of the proceeding" (Reply Br. for App. at 3). But while the concept of reliability does not change, it is—as the preceding discussion shows—the *manner* of determining reliability that differs in the two proceedings. After *Crawford,* whenever "testimonial evidence is at issue, ... the only indicium of reliability sufficient to satisfy" the Sixth Amendment's command "is the one the Constitution actually prescribes: confrontation." *Crawford,* 124 S.Ct. at 1374. But due process "is flexible ... in ... scope," *Morrissey,* 408 U.S. at 481, 92 S.Ct. 2593, and the reliability it demands necessarily invites inquiry into the circumstances surrounding the evidence sought to be admitted and whether it possesses enough earmarks of reliability. *See, e.g., Harris,* 612 A.2d at 202 (information in records contained in probation file bore "recognized indicia of reliability," quoting *Patterson,* 570 A.2d at 1199). Even *Lee, supra,* applying Sixth Amend-

liberty created by probation."); *Ponte v. Real,* 471 U.S. 491, 511–12, 105 S.Ct. 2192, 85 L.Ed.2d 553 (1985) ("*Gagnon v. Scarpelli,* [ ] recognized a due process right to counsel under some circumstances at parole and probation revocation hearings.").

5. The same rule governs in federal probation revocation hearings, where the federal rules of evidence expressly do not apply. See FED. R. EVID. 1101(d)(3). Instead, the general rule—as under this court's cases—is that hearsay evidence may be admitted in the trial court's discretion if it bears sufficient indicia of reliability. *See, e.g., United States v. Stanfield,* 360 U.S.App.D.C. 305, 319, 360 F.3d 1346, 1360 (2004); *see generally* NEIL P. COHEN, THE LAW OF PROBATION AND PAROLE § 20:11 (2d ed. 1999) ("[I]n most jurisdictions, including the federal courts, the trial court has discretion to allow hearsay evidence at revocation hearings if the evidence appears to be relevant, reliable, and probative.")

ment law at the time, recognized that a "presumptively unreliable" codefendant confession without prior cross-examination could be admitted if "the circumstances surrounding the confession . . . rebut[ted that] presumption." 476 U.S. at 544, 106 S.Ct. 2056. All Young can legitimately demand, therefore, is that Judge Duncan–Peters, while recognizing the dangers (such as blameshifting and currying favor) that cast doubt on the trustworthiness of Coleman's statements incriminating Young, had sufficient evidence before her to credit them as reliable proof that Young committed the murder and thereby violated his probation.

## III.

 When we turn to that issue, we are met at once with a similar misapplication by Young of Sixth Amendment principles to the present context. Citing *Idaho v. Wright*, 497 U.S. 805, 110 S.Ct. 3139, 111 L.Ed.2d 638 (1990), he argues that in determining the reliability of Coleman's statements, the trial judge could not properly consider their corroboration by other evidence, including his own admissions. We do not agree. *Wright*, applying pre-*Crawford* law, held only that "the 'particularized guarantees of trustworthiness' required for admission *under the Confrontation Clause* must be . . . drawn from the . . . circumstances that surround the making of the statement and that render the declarant particularly worthy of belief," not from "other evidence at trial that cor-

roborates the truth of the statement." *Wright*, 497 U.S. at 819, 820, 110 S.Ct. 3139 (emphasis added). Young cites no authority requiring similar disregard of the reliability furnished by corroboration at probation revocation hearings. *See, e.g., Stanfield, supra* note 5, 360 U.S.App. D.C. at 319, 360 F.3d at 1360 (in determining whether hearsay evidence bore "sufficient indicia of reliability" under *"Morrissey's* relaxed standard for confrontation," court notes corroboration furnished by extrinsic evidence). Given the quasi-administrative nature of revocation, *Harris, supra,* there is no reason why corroborative evidence, routinely considered relevant to the trustworthiness of hearsay in administrative proceedings, may not serve the same purpose at a revocation hearing. *See, e.g., Robinson v. Smith*, 683 A.2d 481, 489 (D.C. 1996) (" 'among the factors to consider in evaluating the reliability of hearsay evidence [in administrative proceeding is] whether the testimony is corroborated' ") (citation omitted).[6] *Cf. also Wright, supra,* 497 U.S. at 832, 110 S.Ct. 3139 (Kennedy, J., joined by three other Justices, dissenting) ("Our Fourth Amendment cases are also premised upon the idea that corroboration is a legitimate indicator of reliability."). If, for example, Coleman's description of what Young told him replicated other evidence showing Young's knowledge of where his grandmother kept her money, it makes no sense to exclude any part of that evidence from the inquiry into whether Young's conditional liberty should be revoked.

**6.** We have previously held that hearsay evidence should be considered reliable—in an administrative proceeding—"unless it is irrelevant, immaterial, or unduly repetitious." *Robinson*, 683 A.2d at 488 (reviewing Superintendent of D.C. Public Schools administrative determination of reliability) (internal quotation marks omitted). Courts should consider: "whether the declarant is biased, whether the testimony is corroborated, whether the hearsay statement is contradicted by direct testimony, whether the declarant is available to testify and be cross-examined, and whether the hearsay statements were signed or sworn." *Wisconsin Ave. Nursing Home v. District of Columbia Comm'n on Human Rights*, 527 A.2d 282, 288 (D.C.1987) (reviewing Commission on Human Rights administrative determination of reliability).

■ Young makes one additional challenge to the trial judge's consideration of Coleman's hearsay statements. He contends that where revocation of probation is premised on the probationer's commission of a crime that has not (or not yet) resulted in a conviction, the government should be required to prove the crime (hence the probation violation) by clear and convincing evidence. Coleman's hearsay statements, he argues, because "presumptively unreliable," cannot possibly meet that standard. We reject the premise of this argument, *i.e.,* that commission of a new crime, alone among the reasons why probation may be revoked, must be assayed by a heightened standard of proof. In *Harris, supra,* we explained:

Practice has shown that probation violations fall into three general categories: (1) technical (*e.g.,* failing to report to the probation office ...); (2) substantive (*e.g.,* using illegal drugs, or failing to abide by a substantial probation condition such as drug treatment ...); and (3) commission of a new criminal offense.

*Harris,* 612 A.2d at 203 n. 7. We held that, where either of the first two classes of violation are concerned, the government must prove the violation only by a preponderance of the evidence. *Id.* at 203. We left open the issue as to the third category, since the appellant's probation had been revoked "based ... upon a substantive violation." *Id.* at 203 n. 7. Upon consideration, however, and in keeping with the distinction between probation and a criminal prosecution, we hold that the preponderance of the evidence standard governs probation revocation regardless of the basis. That standard has been adopted by the United States Court of Appeals for the District of Columbia Circuit. *See United States v. Hooker,* 301 U.S.App.D.C. 236, 238, 993 F.2d 898, 900 (1993) (probation revoked on basis of drug charges subsequently dismissed). There the court explained that "all of the [Federal] circuits that have considered the issue require only that the judge be reasonably satisfied that the defendant has violated the terms of his probation"—a "standard [that] may be less favorable to the defendant than the preponderance of the evidence test ...." *Id.* at 238, 993 F.2d at 900. The court further noted:

It is ... unclear whether a clear and convincing standard would be in the best interests of defendants as a class. When a district judge makes the initial choice between incarceration and probation, he no doubt considers the ease with which probation can be revoked if the defendant does not honor the conditions of probation. The more difficult we make it for trial judges to revoke probation the less likely they will be to offer defendants probation in the first place.

*Id.* at 238 n. 1, 993 F.2d at 900 n. 1 Additionally, there is weight to the government's argument in this case that the state's "overwhelming interest in being able to return ... to imprisonment" one who has violated probation, *Morrissey,* 408 U.S. at 483, 92 S.Ct. 2593, is at its highest when a new crime has been committed rather than a technical or substantive violation. Finally, the very elusiveness of distinguishing between a "substantive" violation, which may include "using illegal drugs," *Harris, supra,* and commission of a new crime suggests that "it would be illogical to apply different standards of proof to the same act, depending only upon which type of probation violation the defendant is alleged to have committed." *United States v. Johnson,* 123 Daily Wash. L. Rptr. 2373, 2377 (D.C.Super.Ct. Sept. 6, 1995) (J. Canan). For these reasons, we hold that Judge Duncan–Peters was required to find by a preponderance of the evidence—not more, not less—that Young committed the new crime, and her assess-

ment of reliability could properly be guided by that standard.

 Essentially for the reasons stated by the trial judge in her exhaustive written opinion, we sustain her determination that Coleman's hearsay statements, viewed together with the other evidence, were reliable enough to support revocation. Even without Coleman's statements, evidence showed that Young had been caught once before (by Ms. Taylor) in the act of taking money from his grandmother's bedroom dresser; that he had ready access to her house around the time of the theft and murder (there were no signs of forced entry); and that he confessed to having been across the street from her house at a time when the murder could have taken place, ostensibly to aid Coleman in burglarizing his mother's shop. The trial judge further rejected any notion that Coleman's statements to the police had been coerced or in any way prompted by his interrogators,[7] a fact highly significant because Young has offered no other explanation for how Coleman—unreliably—learned details of the crime closely matching the extrinsic evidence. Specifically, Coleman said that Young told him he had gone into his grandmother's bedroom where he knew she kept her money in a drawer and had taken $150 (even showing Coleman a bundle of $10 bills) before she awoke and angrily followed him, and he was forced to beat her. Extrinsic evidence indeed showed that $150 had been taken from an envelope in Ms. Taylor's dresser drawer. Viewing the evidence altogether, Judge Duncan–Peters concluded:

> The [c]ourt may reasonably decline to attribute to coincidence Ms. Taylor's death and [Young's] admitted connection to the scene during the time frame in which her death occurred. Coupled with Mr. Coleman's detailed ... statement that Mr. Young, his best friend, committed the offense, and the additional evidence [including Young's knowledge of where Ms. Taylor kept her money, having retrieved money from her bedroom before] that corroborates Mr. Coleman's ... version of events, the evidence is compelling that Mr. Young did indeed commit the offense.

We agree with this conclusion. The judge therefore properly revoked Young's probation.

*Affirmed.*

---

7. "The [c]ourt has seen no evidence that would lead it to conclude that Mr. Coleman is so pliable that he could be persuaded by a mild-mannered police interrogator to implicate his best friend in a horrific murder."