**In re Maurice AMEY, Appellant.**

No. 09–FM–779.

District of Columbia Court of Appeals.

Argued Feb. 9, 2012.
Decided April 5, 2012.

Sara E. Kopecki, Washington, DC, appointed by the court, for appellant.

Holly M. Johnson, Assistant Attorney General, with whom Irvin B. Nathan, Attorney General for the District of Columbia, Todd S. Kim, Solicitor General, and Donna M. Murasky, Deputy Solicitor General, were on the brief, for the District of Columbia.

Before WASHINGTON, Chief Judge, FISHER, Associate Judge, and KRAVITZ, Associate Judge, Superior Court of the District of Columbia.[*]

KRAVITZ, Associate Judge:

A judge of the Superior Court ordered appellant Maurice Amey's involuntary civil commitment for one year under the Ervin Act after a jury determined that appellant was mentally ill and, as a result, likely to injure himself or others if not committed. On appeal, appellant contends that the trial court erred by allowing a psychiatrist testifying as an expert witness for the government to refer to hospital records and other hearsay information in explaining the bases of his opinions relating to appellant's mental illness and dangerousness. In particular, appellant claims (1) that the trial court failed to make specific findings that the hearsay references were substantially more probative than prejudicial, as required by the 2000 Amendment to Rule 703 of the Federal Rules of Evidence; and (2) that the admission of the hearsay violated his Fifth and Sixth Amendment rights to confront the witnesses against him. We affirm the judgment of commitment.

## I.

Police in the District of Columbia arrested appellant on December 18, 2007, and again on January 6, 2008, following incidents in which appellant approached strangers on the street and punched them in the face. On each occasion, appellant explained to the police that he struck back in self-defense only after the person he hit used a stun gun or other electronic prod to attack his genitals. Police found no evidence of any such device at the scene of either assault.

The Office of the United States Attorney filed formal criminal charges against appellant in the Superior Court after each of the two incidents. On January 16, 2008, however, the judge presiding over the criminal cases found appellant incompetent to stand trial and ordered him detained at Saint Elizabeths Hospital for treatment and further evaluation. See D.C.Code § 24–531.04(c)(3) (2008 Supp.). On April 25, 2008, the judge found that appellant was still incompetent and that he was unlikely to attain competency in the foreseeable future. The judge accordingly determined that the criminal prosecutions could not go forward. See Jackson v. Indiana, 406 U.S. 715, 733, 92 S.Ct. 1845, 32 L.Ed.2d 435 (1972).

The matters were then referred to the District of Columbia Government for the possible initiation of civil commitment proceedings under the Hospitalization of the Mentally Ill Act ("Ervin Act"), D.C.Code §§ 21–501 to –592 (2008 Supp.). On May 5, 2008, the Office of the Attorney General filed a petition in the Superior Court on behalf of the Department of Mental Health, seeking appellant's involuntary civil commitment for a period of one year. The government alleged that appellant was mentally ill and, as a result, likely to injure

* Sitting by designation pursuant to D.C.Code § 11–707(a) (2001).

himself or others if not committed for treatment.

Appellant remained detained at Saint Elizabeths Hospital throughout the pendency of the civil commitment action. *See* D.C.Code § 21–528 (2001). The case proceeded to trial on June 8, 2009 before a jury of twelve.

The government began its case-in-chief by presenting direct evidence of the two assaults appellant committed in the community. Jeffrey Anderson testified that he was on his way to meet some friends at approximately 9:15 p.m. on December 18, 2007 when appellant approached him on the sidewalk of Connecticut Avenue, N.W., a few blocks south of Dupont Circle. Appellant walked up to Mr. Anderson, yelled "you fucking faggot" at him, and punched him in the face before walking slowly away. Grace Chen testified that she was walking home from a neighborhood fitness center at approximately 8:00 p.m. on January 6, 2008 when appellant approached her on the sidewalk of Connecticut Avenue, N.W., a few blocks north of Dupont Circle. Appellant muttered several curse words in Ms. Chen's direction and then hit Ms. Chen on the side of her face when she made a move to cross the street to try to get away from him.

Both victims called 911, and the police promptly detained appellant after each assault. Sergeant Brett Parson was one of the officers who responded to Mr. Anderson's report on December 18, 2007. Sergeant Parson testified that he participated in the questioning of appellant and "heard [him] say that the reason why he attacked the person he attacked was because [the person] was a homosexual who had used an electronic prod on his testicles and that he was defending himself from that attack." Sergeant Parson testified

further that he conducted a consent search of Mr. Anderson and determined that he "had nothing on him whatsoever resembling a stun gun, electronic prod or anything of the sort." Officer Ethel Taylor responded to Ms. Chen's report on January 6, 2008. Officer Taylor testified that she heard appellant say that a "man" attacked him and used a stun gun or taser "to touch his private area, his genitals." She testified further that Ms. Chen clearly appeared to be a woman and that neither Ms. Chen nor appellant had any object that "even remotely" looked like a taser.[1]

The government then called Dr. Andrew Schwartz, a psychiatrist at Saint Elizabeths Hospital, as its final witness. Dr. Schwartz testified that he was appellant's attending psychiatrist at the hospital from January 2008 through January 2009 and that he had continued to monitor appellant's condition in the months leading up to the trial. Without objection from appellant, the trial court accepted Dr. Schwartz as an expert in the treatment and diagnosis of mental illness.

The government elicited significant details from Dr. Schwartz regarding the bases of his expert opinions. Dr. Schwartz explained to the jury that in the year-long period in which he served as appellant's attending psychiatrist, he reviewed records of appellant's past psychiatric hospitalizations and treatment, met with appellant approximately eighteen times, interviewed members of appellant's family, read the records of appellant's daily progress on the ward, and had frequent discussions about appellant's ongoing care and treatment with the other mental health professionals on appellant's treatment team. Dr. Schwartz explained further that in the four or five months since he stopped serving as

---

1. At the direction of the trial court, the parties and witnesses at the civil commitment trial made no mention in the presence of the jury of appellant's arrests or criminal prosecutions for the incidents of December 18, 2007 and January 6, 2008.

appellant's attending psychiatrist, he kept abreast of appellant's condition through additional interviews with appellant, careful review of the daily progress reports in appellant's hospital chart, and numerous discussions with the psychiatrists, psychologists, social workers, nurses, and nursing assistants who monitored and cared for appellant every day. Finally, Dr. Schwartz stated that he had been present in the courtroom throughout the trial and that, in formulating his opinions, he had considered the testimony of Mr. Anderson, Ms. Chen, Sergeant Parson, and Officer Taylor, as well as written police reports relating to the incidents of December 18, 2007 and January 6, 2008.

Dr. Schwartz then told the jury that it was his opinion, to a reasonable degree of medical certainty, that appellant suffered from paranoid schizophrenia throughout his stay at Saint Elizabeths Hospital and continued to be affected by this serious psychiatric disorder at the time of trial. Dr. Schwartz explained that appellant's mental illness caused him to experience delusions, i.e. intensely held beliefs that are not corroborated by the observations of others or any known facts. Dr. Schwartz stated that appellant's paranoia was manifest in many of his delusions. Specifically, Dr. Schwartz described how appellant believes "that certain individuals in the community carry around with them various electronic devices, including tasers and lasers, which they un-provokingly use to stimulate his genitals," and how appellant "also believes that there are a significant number of people in the community who bear him ill will who are transgendered homosexual men." Dr. Schwartz described other delusions of appellant's as grandiose. For example, appellant repeatedly insisted that he was married to a glamorous television personality in Los Angeles and that he was a graduate of the University of California at Berkeley and the University of Southern California School of Law—claims that had been refuted by appellant's parents, who told Dr. Schwartz that appellant was not married and had never completed high school.

Dr. Schwartz stated that, in his opinion, appellant's delusions of being the target of sexually aggressive acts by homosexual and transgendered men led appellant to assault Mr. Anderson and Ms. Chen (who appellant likely believed was a transgendered man) in the community. Those same delusions, Dr. Schwartz stated, caused appellant to continue to act in an assaultive manner toward other patients in the hospital. Dr. Schwartz explained that he reached these conclusions based in part on his own observations and in part on the reports and statements of other professionals responsible for appellant's care in the hospital. As one example of his partial reliance on hearsay information in formulating his opinions, Dr. Schwartz described appellant's generally hostile relationships with other male patients as follows:

In the course of [his] hospitalization, there have been incidents in which he has become involved in altercations ... involving other patients. And one repeated theme in [his] behavior and presentation is a belief that other people are making homosexual advances to him. He, for example, has told staff members and me that he believes that other patients were making overtures to him trying to, and I quote him, trying to jerk me off, close quote. He has believed that [another patient's] normal arm swing [while walking] ... represents the expression of a wish to perform masturbatory acts on him. He has also believed, apparently he has stated this to staff, that passing gas also can constitute a homosexual advance—that it's an invitation ... to homosexual intercourse. And on April 16, I believe it was of 2008, there was an incident in which he became very upset in one of the bedrooms

on the ward because another patient passed gas and he believed that this was that kind of sexual invitation. [He] is very sensitive to these issues.

Similarly, Dr. Schwartz referred to notes in appellant's hospital records in telling the jury that appellant started a physical fight with a fellow patient appellant believed had blown him a kiss and that, on a different occasion, appellant bit another patient's finger because he thought the other patient was making a sexual overture to him in the bathroom.

Although he acknowledged that appellant had made some progress during his hospitalization, Dr. Schwartz concluded that appellant continued to have a tendency at the time of trial to become very angry and to initiate physical altercations with others as a result of his delusions. Noting that appellant did not accept his own diagnosis, Dr. Schwartz predicted that appellant would refuse to take medication outside of a structured hospital setting and would thus continue to present a risk of injury to himself or others if he was not required to receive ongoing psychiatric treatment on an inpatient basis.

Appellant testified as the first witness in his defense case. He denied that he was mentally ill and explained his participation in the incidents involving Mr. Anderson, Ms. Chen, and the other patients on the ward as efforts on his part to protect himself from the hostile and sexually aggressive acts of others.

Appellant then called Dr. Michele Godwin, a clinical psychologist at the hospital and a member of his treatment team throughout his stay there, as an expert witness. Dr. Godwin told the jury that the members of appellant's current treatment team believed that appellant was sufficiently stable, after more than a year in the hospital, to be treated successfully on an outpatient basis. She conceded on cross-examination, however, that appellant was mentally ill and likely to injure himself or others if not court-ordered to participate in outpatient psychiatric treatment.

At appellant's request, the trial court included within its final instructions to the jury the following limiting instruction on an expert witness's references to hearsay information:

During the doctors' testimony, you heard the doctors make reference to information given to them by other individuals. These statements [were] admitted into evidence only to demonstrate the information relied [on] by the doctor[s] in forming their conclusions. The statements are to be considered by you only for the purpose of evaluating the reasonableness of the doctors' conclusions. You are not to consider them as actual proof of the facts described. They are hearsay and as such are not admitted in order to establish the truth of the facts described.

Earlier in the trial, the court had offered to give this limiting instruction two times—first during Dr. Schwartz's testimony, and again at the end of the trial. The parties, however, were in agreement that the instruction should be given only once, as part of the court's final instructions.

The jury returned a verdict on June 11, 2009, finding, by clear and convincing evidence, that appellant had a mental illness and, as a result, was likely to injure himself or others if not committed. On June 24, 2009, the trial court ordered appellant involuntarily committed to the Department of Mental Health for one year as an outpatient.

This timely appeal followed.

## II.

■ Appellant's one-year commitment expired by its own terms on or about June

24, 2010, and appellant is no longer subject to court-ordered treatment in this case. As an initial matter, therefore, we must determine whether this appeal is moot. We have never squarely addressed the question whether we have jurisdiction to consider an appeal from a final order of involuntary civil commitment after the expiration of the commitment.

In *In re Morris*, 482 A.2d 369 (D.C. 1984), we considered whether we could review the validity of an initial, seven-day emergency detention order under the Ervin Act in a case in which the patient had been changed to voluntary status and discharged from the hospital by the time the case reached us on appeal. We held that the appeal was not moot, first, because an emergency confinement on the grounds of mental illness and dangerousness "'may have continuing collateral consequences which should be dispelled if the confinement was, in fact, unlawful,'" *id.* at 371–72 (quoting *In re Curry*, 470 F.2d 368, 371 (D.C.Cir.1972)), and second, because the situation is "capable of repetition yet evading review" given the inability of the parties to litigate an appeal during the brief emergency confinement and the reasonable expectation that the patient would be subject to another such confinement in the future, *id.* at 372 (citing *S. Pac. Terminal Co. v. ICC*, 219 U.S. 498, 515, 31 S.Ct. 279, 55 L.Ed. 310 (1911); *United States v. Edwards*, 430 A.2d 1321, 1324 n. 2 (D.C.1981) (en banc)). To illustrate the continuing collateral consequences of even a brief emergency involuntary confinement, we noted that the hospital had already relied on the emergency hospitalization challenged on appeal in seeking the patient's involuntary civil commitment approximately ten months later. *Id.* at 372.

The D.C. Circuit addressed the question whether the appeal of an expired final civil commitment order was moot in *In re Ballay*, 482 F.2d 648 (D.C.Cir.1973). There,

the patient had been released in less than five months from each of three final orders of involuntary civil commitment, and the evidence indicated a likelihood of future mental health problems. The court held that the appeal was not moot, because the issues raised were "capable of repetition yet evading review" in light of the patient's release "in far less time than necessary to perfect an appeal," and because an adjudication of mental illness carries a "multitude" of collateral consequences that "remain to plague" a former involuntary patient after the expiration of the commitment. *Id.* at 651. In particular, the court noted that a person whose involuntary civil commitment has expired may continue to face state constitutional and statutory limitations on the person's ability to vote, serve on a jury, dispose of property, execute contracts, and obtain a license to drive or to possess a gun, and that an adjudication of mental illness will always be "an ominous presence in any interaction between the individual and the legal system" and "will certainly be used in any subsequent proceedings for civil commitment." *Id.* at 651–52.

*Ballay* is not binding on us, but the analysis on which it rests remains sound several decades later. As the government conceded at oral argument, a final order of involuntary civil commitment on the ground of mental illness and dangerousness imposes significant and continuing collateral consequences on the patient long after the expiration of the commitment. This appeal, therefore, is not moot even though appellant's one-year involuntary civil commitment has expired.

We now turn to the merits of appellant's arguments on appeal.

## A.

Appellant contends that the trial court erred by permitting Dr. Schwartz to testi-

fy to the hearsay bases of his expert opinions without first finding that the legitimate probative value of the hearsay substantially outweighed its prejudicial effect. Appellant states that we have adopted Rule 703 of the Federal Rules of Evidence in the District of Columbia and that the rule, as amended in 2000, requires such findings before an expert witness may testify on direct examination to the hearsay or otherwise inadmissible bases of his opinions.

▇ Appellant makes this argument for the first time on appeal, and our review, accordingly, is for plain error. "Under the plain error doctrine, appellant must establish (1) that the trial court committed error; (2) that the error was 'plain,' i.e., 'clear' or 'obvious'; (3) that the error affected substantial rights; and (4) that a failure to correct the error would seriously affect the fairness, integrity, or public reputation of judicial proceedings." *Marshall v. United States*, 15 A.3d 699, 710 (D.C. 2011) (quoting *United States v. Olano*, 507 U.S. 725, 732–36, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993)). Appellant has not made the requisite showing.

In *L.C.D. v. District of Columbia*, 488 A.2d 918 (D.C.1985), we considered whether a medical doctor appearing as an expert witness in a paternity case could testify to an opinion based in part on the results of a blood test performed by a technician who did not testify at trial. We held that the doctor's reliance on the hearsay results of the blood test was permissible because, under the common law of the District of Columbia, opinion testimony based in part on the hearsay reports of others is admissible as long as the hearsay reports are of a type customarily relied on by experts in the field. *Id.* at 921 (citing *Jenkins v. United States*, 307 F.2d 637, 641–42 (D.C.Cir.1962)). We noted that although the Federal Rules of Evidence had not been adopted in the District of Columbia,

Rule 703 was an accurate statement of the common law of evidence in this jurisdiction. *Id.* at 921 n. 8. At the time, Rule 703 provided: "The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to him at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence." FED. R.EVID. 703 (1972).

Six years later, in *In re Melton*, 597 A.2d 892 (D.C.1991) (en banc), we gave plenary consideration to the questions whether an expert witness may testify to opinions that are based in part on hearsay or other inadmissible information and, if so, whether certain precautions should be taken at trial to ensure that any references to the inadmissible information are considered by the jury only in assessing the reasonableness of the expert's opinions and not as substantive evidence. The questions presented in *Melton* arose in the context of an involuntary civil commitment proceeding in which a psychiatrist, testifying as an expert witness for the government, referred on direct examination to entries in the patient's hospital records and to information provided by members of the patient's family in explaining his opinions that the patient was mentally ill and likely to injure himself or others if not committed for treatment.

We held, as a matter of local evidence law, that the opinions of an expert witness may be based in part on hearsay or other inadmissible information as long as the hearsay or other inadmissible information meets minimum standards of reliability and is of a type reasonably (i.e. customarily) relied on in the practice of the expert witness's profession. *Melton*, 597 A.2d at 901–04. We thus confirmed our view that Rule 703 accurately reflected the common

law of evidence in the District of Columbia, and we noted that the federal rule, which had undergone only minor stylistic changes since our decision in *L.C.D.*, was " 'designed to broaden the basis for expert opinions beyond that current in many jurisdictions and to bring the judicial practice into line with the practice of the experts themselves when not in court.' " *Id.* at 901 (quoting FED.R.EVID. 703 Advisory Committee's Note on Proposed Rule).

We emphasized in *Melton* that an expert witness's references to hearsay and other inadmissible information must be strictly limited to matters actually considered by the expert and that it must be of a type customarily relied on by experts in the field. *Id.* at 907–09. We thus made clear that whenever an expert witness seeks to testify to opinions based in part on inadmissible information, the trial court must make explicit findings concerning the reasonableness of the expert's reliance on the information in formulating his opinions. *Id.* We also suggested that the trial court instruct the jury that hearsay statements and other inadmissible information referred to in the course of an expert witness's testimony have been presented only to assist the jury in its assessment of the reasonableness of the expert's opinions and may not be considered as substantive evidence. *Id.* at 906. We even intimated that such an instruction might best be given both at the time of the expert's testimony and at the end of the trial to minimize the likelihood of the jury's misuse of the evidence. *Id.*

We nevertheless acknowledged the significant risk that an expert witness's references to the hearsay bases of his opinions will be used improperly by the jury notwithstanding appropriate limiting instructions. *Melton*, 597 A.2d at 906–07. This risk was of particular concern in *Melton* itself because the psychiatrist in the case was permitted to tell the jury about an incident in which the patient reportedly lost his temper and punched his own mother in the nose, even though neither the patient's mother nor any other witness to the alleged assault testified at trial. *Id.* at 906. Citing our earlier decision in *In re Samuels*, 507 A.2d 150, 153 n. 5 (D.C.1986), we noted a serious "conceptual" problem raised by an expert witness's references to hearsay about such a dramatic act:

> To tell the jurors that they are to consider the testimony about the punch as a basis for the expert's finding of dangerousness, but not with respect to whether Mr. Melton punched his mother, may call for mental gymnastics which only the most pristine theoretician could perform. We suspect that the reaction of that elusive individual, the reasonable person, would be that you cannot believe that the testimony about the punch tends to show that Melton is dangerous unless you first believe that he actually punched his mother.

*Melton*, 597 A.2d at 907.

Despite our concerns, however, our primary focus in *Melton* was on the admissibility of an expert witness's *opinions* rather than on the admissibility of the hearsay *bases* of those opinions. We took judicial notice of the fact that psychiatrists assessing a patient's dangerousness due to mental illness customarily review the patient's hospital records and consult with members of the patient's family, *id.* at 908–09, and we observed that the trial court gave a limiting instruction to the jury, albeit only at the end of the trial, *id.* at 906. We thus affirmed the order of commitment, notwithstanding the trial court's failure to make the requisite findings concerning the reasonableness of the expert's reliance on either the patient's hospital records or the statements of the patient's relatives. *Id.* at 908.

█ Given the limited focus of our inquiry in *Melton*, we resolved the case with-

out endeavoring to provide clear guidance on the circumstances in which an expert witness may refer, on direct examination, to the hearsay or otherwise inadmissible information on which his opinions are based.[2] That guidance has emerged through our decisions in other cases.

■ In *Reed v. United States,* 584 A.2d 585, 591 (D.C.1990), decided a year before *Melton,* we held that an expert witness may refer on direct examination to the hearsay bases of his opinions unless the trial court finds "that the probative value of such testimony [is] substantially outweighed by [the] danger of the testimony misleading the jury and unnecessarily prolonging the trial." That is, "[e]ven if [the expert witness's opinion is] admissible under Rule 703 ... the testimony of the facts and data underlying the expert's opinion is subject to exclusion under FED.R.EVID. 403." *Id.* We reached the same conclusion a few years after *Melton,* in *Lyons v. Barrazotto,* 667 A.2d 314 (D.C.1995). There, we stated that "[h]earsay of the kind upon which medical experts customarily rely in formulating an opinion 'is properly brought to the jury's attention,'" *id.* at 326–27 (quoting *Samuels,* 507 A.2d at 154), although "the trial court can properly exclude evidence which is otherwise admissible if it finds that its probative value is substantially outweighed by its prejudicial effect," *id.* at 327. *See also District of Columbia v. Banks,* 646 A.2d

972, 980 (D.C.1994) (depositions relied on by a testifying expert are admissible to show the bases of the expert's opinions because they are of a type reasonably relied on by experts in the field); *Wilkes v. United States,* 631 A.2d 880, 893 n. 4 (D.C. 1993) ("[W]e readily allow the admission of hearsay statements, generally unreliable, as part of the material on which an expert relied in opining on the mental condition of one whom the government seeks to civilly commit."). Under the common law of the District of Columbia, therefore, the hearsay bases of an expert witness's opinions may be presented to the jury on direct examination of the expert, subject to a proper limiting instruction, unless their legitimate probative value in assisting the jury's assessment of the reasonableness of the opinions is substantially outweighed by their prejudicial effect, i.e. by the risk that, despite the limiting instruction, the jury will consider the hearsay as substantive evidence. *See Johnson v. United States,* 683 A.2d 1087, 1100 (D.C.1996) (en banc) (generally adopting the standard set forth in Rule 403 of the Federal Rules of Evidence as part of the common law of evidence in the District of Columbia).

The federal courts have taken a decidedly different approach in recent years. In particular, Rule 703 was amended in 2000 through the addition of the following sentence: "Facts or data that are otherwise inadmissible shall not be disclosed to the jury by the proponent of the opinion or inference unless the court determines that

**2.** Limitations on the admissibility of the hearsay or otherwise inadmissible bases of an expert witness's opinions apply only to testimony elicited by the proponent of the expert witness. Under both the common law of evidence in the District of Columbia and the Federal Rules of Evidence, an adverse party is permitted to elicit the bases of an expert witness's opinions on cross-examination regardless of whether the bases of the opinions have been presented to the jury or ruled inadmissible on direct examination. *See Clifford v.*

*United States,* 532 A.2d 628, 633 (D.C.1987) (Although "the basis of expert opinions need not be stated on direct examination ... an expert witness 'may in any event be required to disclose the underlying facts or data on cross-examination.'") (quoting FED.R.EVID. 705); FED.R.EVID. 703 Advisory Committee's Note on 2000 Amendment ("Nothing in this Rule restricts the presentation of underlying expert facts or data when offered by an adverse party.").

their probative value in assisting the jury to evaluate the expert's opinion substantially outweighs their prejudicial effect." FED.R.EVID. 703 (2000). After a further stylistic amendment in 2011, Rule 703 now provides the following, in its entirety:

An expert may base an opinion on facts or data in the case that the expert has been made aware of or personally observed. If experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject, they need not be admissible for the opinion to be admitted. But if the facts or data would otherwise be inadmissible, the proponent of the opinion may disclose them to the jury only if their probative value substantially outweighs their prejudicial effect.

FED.R.EVID. 703.[3]

■ The federal courts have thereby reversed, in this limited area, the Rule 403 balancing of probative value and prejudicial effect that governs the admissibility of virtually all relevant evidence in federal trials and that we have adopted as part of the common law in this jurisdiction. Thus, whereas the common law of evidence in the District of Columbia *favors* the admis-

sion of an expert's testimony about the hearsay bases of his opinions and permits its presentation on direct examination unless its legitimate probative value is substantially outweighed by the risk of unfair prejudice (i.e. the risk that the jury will misuse the testimony and consider it as substantive evidence), Rule 703 now *disfavors* the admission of such testimony and requires its exclusion unless the risk of unfair prejudice is substantially outweighed by its legitimate probative value. *See* FED.R.EVID. 703 Advisory Committee's Note to 2000 Amendment ("The amendment provides a presumption against disclosure to the jury of information used as the basis of an expert's opinion and not admissible for any substantive purpose, when that information is offered by the proponent of the expert.").

The current version of Rule 703 reflects a thoughtful and well-reasoned approach to the conceptual problem we identified in *Samuels* and discussed at length in *Melton*. It is an approach we have never adopted, however, and as discussed above, it is directly at odds with the way the common law of evidence has developed in the District of Columbia.[4]

3. The Advisory Committee's Note on the 2000 Amendment to Rule 703 describes the new approach of the federal courts as follows:

Rule 703 has been amended to emphasize that when an expert reasonably relies on inadmissible information to form an opinion or inference, the underlying information is not admissible simply because the opinion or inference is admitted.... When information is reasonably relied upon by an expert and yet is admissible only for the purpose of assisting the jury in evaluating an expert's opinion, a trial court applying this Rule must consider the information's probative value in assisting the jury to weigh the expert's opinion on the one hand, and the risk of prejudice resulting from the jury's potential misuse of the information for substantive purposes on the other. The information may be disclosed to the jury,

upon objection, only if the trial court finds that the probative value of the information in assisting the jury to evaluate the expert's opinion substantially outweighs its prejudicial effect. If the otherwise inadmissible information is admitted under this balancing test, the trial judge must give a limiting instruction upon request, informing the jury that the underlying information must not be used for substantive purposes.... In determining the appropriate course, the trial court should consider the probable effectiveness or lack of effectiveness of a limiting instruction under the particular circumstances.

FED.R.EVID. 703 Advisory Committee's Note to 2000 Amendment.

4. We have indicated our reliance on the post–2000 version of Rule 703 in one case, *Presley v. Commercial Moving & Rigging, Inc.*, 25

■ Accordingly, it was not error—and certainly not clear or obvious error—for the trial court to allow Dr. Schwartz to refer on direct examination to the hearsay bases of his opinions without first making specific findings that the legitimate probative value of the hearsay substantially outweighed its risk of unfair prejudice. A requirement that such findings be made, now enforced in the federal courts via the 2000 Amendment to Rule 703, is inconsistent with the common law of evidence in the District of Columbia as set forth in our precedents.

■ In any event, there is no indication in the record that the references in Dr. Schwartz's testimony to the hearsay bases of his opinions had any unfair prejudicial effect on appellant's substantial rights or on the fairness, integrity, or public reputation of the proceedings in this case. First, appellant's own expert witness, Dr. Godwin, conceded in her testimony that appellant was mentally ill and likely to injure himself or others if not committed for treatment. Dr. Schwartz's opinions on the two essential issues presented to the jury for decision were thus corroborated in full by the evidence presented by appellant himself. Second, appellant has not identified a single item of hearsay mentioned by Dr. Schwartz that would have been excluded under the different balancing test prescribed by the 2000 Amendment to Rule 703. There is no basis to believe, therefore, that application of the current version of Rule 703 would have made any difference at appellant's trial. Indeed, the balancing test now required by Rule 703 is applicable, even in the federal courts, only "upon objection," FED. R.EVID. 703 Advisory Committee's Note on 2000 Amendment, and appellant never objected in the trial court to any of Dr. Schwartz's hearsay references on the ground that they were not substantially more probative than prejudicial. Third, the two victims of appellant's assaults in the community testified live before the jury and were subject to cross-examination by appellant's counsel. Therefore, although Dr. Schwartz subsequently relied in part on hearsay information in describing appellant's assaultive conduct in the hospital, this is not a case in which the most sensational incidents involving the patient were communicated to the jury through an expert witness's references to the hearsay statements of non-testifying witnesses, and the conceptual problem at the forefront of our analysis in *Melton* is thus largely absent here. Fourth, the trial judge gave an appropriate limiting instruction to the jury at the end of the trial, and appellant, through his trial counsel, expressly declined the court's offer to repeat the instruction at the time of Dr. Schwartz's testimony. Fifth, and finally, although the trial court did not make the specific findings required by *Melton* concerning the reasonableness of Dr. Schwartz's reliance on the hearsay bases of his opinions, the hospital records and out-of-court statements of other medical

A.3d 873, 893 n. 17 (D.C.2011). However, our opinion in *Presley* did not acknowledge either that Rule 703 had been amended since the issuance of our en banc decision in *Melton* or that the post–2000 version of the rule was inconsistent with our common law precedents. We thus conclude that "the judicial mind was not asked to focus upon, and the opinion did not address, the point at issue." *Alfaro v. United States,* 859 A.2d 149, 154 (D.C.2004) (quotations omitted). Moreover, the post–2000 version of Rule 703 "was not essential to the decision" in *Presley, see Bishop v. United States,* 983 A.2d 1029, 1038 (D.C. 2009), and the division that decided the case had no authority to overrule the earlier, binding decisions of this court applying a Rule 403 balancing to the admissibility of the hearsay bases of an expert witness's opinions, *M.A.P. v. Ryan,* 285 A.2d 310, 312 (D.C.1971). *Presley* therefore "is not binding on us for this purpose." *Bishop,* 983 A.2d at 1038.

professionals and members of appellant's family to which Dr. Schwartz referred in his testimony were clearly considered by Dr. Schwartz in formulating his opinions and are unquestionably of the types customarily relied on by psychiatrists charged with assessing a patient's dangerousness and need for treatment. *See In re Artis,* 615 A.2d 1148, 1151 (D.C.1992); *Melton,* 597 A.2d at 907–08. There was no plain error here.

### B.

Appellant next contends that the admission of the hearsay references in Dr. Schwartz's testimony violated his Fifth and Sixth Amendment rights to confront the witnesses against him. Relying on the Supreme Court's decision in *Crawford v. Washington,* 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004), appellant claims that the hearsay references should have been excluded under the Confrontation Clause of the Sixth Amendment as the testimonial statements of witnesses who had not been shown to be unavailable at trial and had not been subjected to his prior cross-examination. Even if the Sixth Amendment is inapplicable in this non-criminal setting, appellant contends, the *Crawford* rule should be incorporated into a Fifth Amendment due process analysis aimed at protecting the reliability of the fact finding process, given the significance of the deprivation of liberty at stake in an involuntary civil commitment proceeding.

Appellant made no mention of either of these constitutional claims in the trial court. Our review on appeal, therefore, is once again limited to plain error analysis.

The Supreme Court held in *Crawford,* 541 U.S. at 59, 124 S.Ct. 1354, that the Confrontation Clause of the Sixth Amendment prohibits the admission at a criminal trial of a witness's testimonial out-of-court statement unless the witness is unavailable and the accused has been afforded a prior

opportunity to cross-examine the witness. By its express terms, however, the Sixth Amendment applies only to "criminal prosecutions," U.S. CONST. amend. VI, and we have thus far declined to extend the *Crawford* doctrine beyond the core stages of criminal cases. For example, we held in *Young v. United States,* 863 A.2d 804, 807–08 (D.C.2004), that *Crawford* does not apply in a probation revocation proceeding, a portion of a criminal case we characterized as "more in the nature of an administrative hearing concerned with the probationer's rehabilitation" than "a stage of a criminal prosecution." We reached an analogous conclusion in *In re A.B.,* 999 A.2d 36, 43 n. 22 (D.C.2010), where we noted that because the Sixth Amendment applies only in criminal prosecutions, it imposes no limits on the ability of an expert witness in an abuse and neglect case to testify to opinions based on hearsay or other inadmissible evidence.

An involuntary civil commitment certainly constitutes a significant deprivation of an individual's liberty. Such a commitment, however, is still in many ways distinct from a criminal conviction and sentence, *Addington v. Texas,* 441 U.S. 418, 427–30, 99 S.Ct. 1804, 60 L.Ed.2d 323 (1979), and to our knowledge every federal and state appellate court that has considered the question in the wake of *Crawford* has determined that the Sixth Amendment does not apply in involuntary civil commitment proceedings, *see, e.g., In re Stout,* 159 Wash.2d 357, 150 P.3d 86, 92–93 (2007); *Commonwealth v. Given,* 441 Mass. 741, 808 N.E.2d 788, 793 n. 8 (2004); *see also Walker v. Hadi,* 611 F.3d 720, 724 (11th Cir.2010).

■ We agree, and we hold that the Confrontation Clause of the Sixth Amendment is inapplicable in involuntary civil commitment proceedings in the District of Columbia. We conclude, accordingly, that

the trial court did not plainly violate appellant's rights under the Confrontation Clause by failing, *sua sponte*, to exclude the hearsay bases of Dr. Schwartz's expert opinions.

 Nor did the trial court plainly infringe any Fifth Amendment due process right of confrontation when it failed, *sua sponte*, to apply the *Crawford* doctrine to Dr. Schwartz's testimony. Although the constitutional guarantee of due process includes a qualified right of confrontation in certain proceedings other than criminal trials, *see, e.g., Gagnon v. Scarpelli*, 411 U.S. 778, 781–82, 786, 93 S.Ct. 1756, 36 L.Ed.2d 656 (1973) (probation revocation); *Morrissey v. Brewer*, 408 U.S. 471, 489, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972) (parole revocation), reliability is a core objective of all due process protections, *see Manson v. Brathwaite*, 432 U.S. 98, 114, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977); *Mathews v. Eldridge*, 424 U.S. 319, 343, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976), and in particular of the qualified due process right of confrontation, *see Young*, 863 A.2d at 808–09. As we explained in *Young*, the requirement that a witness's reliability be tested in a criminal trial according to the method prescribed by the Sixth Amendment yields in non-criminal proceedings to a more flexible approach of ensuring reliability as a matter of due process:

> After *Crawford*, whenever testimonial evidence is at issue, the only indicium of reliability sufficient to satisfy the Sixth

Amendment's command is the one the Constitution actually prescribes: confrontation. But due process is flexible in scope, and the reliability it demands necessarily invites inquiry into the circumstances surrounding the evidence sought to be admitted and whether it possesses enough earmarks of reliability.

*Id.* at 808 (internal quotations and citations omitted).[5]

Our due process inquiry on plain error review is thus limited to whether application of the *Crawford* rule was plainly essential to protect the reliability of Dr. Schwartz's testimony. Certainly it was not. Dr. Schwartz's opinions on the determinative issues of mental illness and dangerousness were fully corroborated by the testimony of appellant's own expert witness and were admitted in accordance with the common law of evidence in the District of Columbia, subjected to cross-examination by appellant's counsel, and appropriately addressed in a limiting instruction to the jury. Although not fully coextensive with the confrontation rights guaranteed by the Sixth Amendment in criminal trials, the opportunity appellant was afforded to confront Dr. Schwartz's expert testimony was more than adequate to protect the fundamental fairness and reliability of Dr. Schwartz's testimony and, more generally, of this involuntary civil commitment pro-

---

**5.** Indeed, it remains an open question whether even in a criminal trial it is error under *Crawford* for the hearsay bases of the opinions of an expert witness testifying for the government to be presented in accordance with *Melton* and subject to an appropriate limiting instruction. We have twice expressly declined to resolve "the interplay between the Confrontation Clause and our precedents concerning the introduction of expert testimony," *see Veney v. United States*, 936 A.2d 809, 810 (D.C.2007); *Roberts v. United States*, 916 A.2d 922, 939 (D.C.2007), and a similar issue is now pending before the United States Supreme Court, in *Williams v. Illinois*, —— U.S. ——, 131 S.Ct. 3090, 180 L.Ed.2d 911 (U.S. June 28, 2011) (granting certiorari on the question "whether a state rule of evidence allowing an expert witness to testify about the results of DNA testing performed by non-testifying analysts, where the defendant has no opportunity to confront the actual analysts, violates the Confrontation Clause").

ceeding. There was no plain error here, either.

## C.

Appellant advances two final arguments on appeal arising from the references in Dr. Schwartz's testimony to the hearsay bases of his opinions. Neither argument warrants significant discussion.

First, appellant asserts that the trial court failed to limit the hearsay references to information on which Dr. Schwartz actually relied in formulating his expert opinions. This assertion finds no factual support in the record. Appellant has not pointed to a single unrelated hearsay reference to the hospital records or elsewhere, and it is clear from a fair reading of the trial transcript that Dr. Schwartz considered all of the hearsay information mentioned in his testimony in reaching his conclusions concerning appellant's mental illness and dangerousness.

Second, appellant claims that the trial court failed to preclude the government from presenting the hearsay to the jury as substantive evidence of appellant's mental illness and dangerousness. This claim, too, is belied by the record. The trial judge correctly instructed the jury (and offered to do so a second time) that references to hearsay information by the expert witnesses on both sides were admitted only to show what the doctors relied on in formulating their expert opinions and were to be considered by the jury only for the purpose of evaluating the reasonableness of the doctors' conclusions, not as actual proof of the matters described. Government counsel acted in accordance with this instruction throughout the trial and never urged the jury to believe the substance of any of the hearsay bases of Dr. Schwartz's opinions.

## III.

For the foregoing reasons, the judgment of involuntary civil commitment is affirmed.

*So ordered.*